PEOPLE v. KASEM.

1. HOMICIDE—CAUSE OF DEATH—EVIDENCE — SUFFICIENCY — QUESTION FOR JURY.
    In a prosecution for homicide by shooting, evidence that death resulted from the wound caused by the bullet, *held*, sufficient to carry the case to the jury.[1]

2. CRIMINAL LAW—HOMICIDE—VIEW OF PREMISES—PRESUMPTION THAT ARRANGEMENT WAS AGREEABLE TO DEFENDANT'S COUNSEL.
    Where all that the record shows is that it was agreed that the jury might view the premises where the shooting occurred, it must be assumed that the arrangement was agreeable to defendant's counsel.[2]

3. SAME—JURY SHOULD BE ACCOMPANIED BY JUDGE AND ATTORNEYS.
    The jury, when viewing the premises, should be accompanied by the judge and the attorneys.[3]

4. SAME—CONDITIONS UNDER WHICH VIEW SHOULD BE ORDERED.
    Although, under 3 Comp. Laws 1915, § 15825, it is discretionary in the court to order a view of the premises, it should be done only in cases where it is uncertain whether the jury have been able to visualize the surroundings from the testimony.[4]

5. SAME—HOMICIDE—FINDING REVOLVER ON PREMISES BY JUROR—DISCUSSION THEREON NOT PREJUDICIAL.
    Where one of the jurors, while the jury were viewing the premises, discovered a revolver in the place where defendant's witness had sworn that it was, discussion following its production by the juror as to whether the bullet taken from the body of deceased would fit it was not prejudicial; defendant's counsel apparently attaching no significance to the incident.[5]

6. SAME—TRIAL—ARGUMENT BY PROSECUTOR.
    In a prosecution for homicide, argument by the prosecuting attorney that defendant's uncle, who after the charge as to him was dismissed claimed that he did the shooting, should have taken the stand in the court below so that.

[1]Homicide, 30 C. J. §§ 531, 571; [2]Criminal Law, 16 C. J. § 2090 (1926 Anno); [3]Id., 16 C. J. §§ 2061, 2090; [4]Id., 16 C. J. § 2090; [5]Id., 16 C. J. § 2551; 17 C. J. § 3715.
On threat to dismiss jury in criminal case for term, unless they could agree on verdict, as coercion, see note in 10 A. L. R. 421.
On effect of judge communicating with jury, not in open court, see note in 17 L. R. A. (N. S.) 609.

his claim could be investigated, *held*, not reversible error, in view of the fact that defendant's counsel very ably answered said argument.[6]

7. SAME—WHERE LAW CORRECTLY GIVEN LANGUAGE USED IS IMMATERIAL.

If the trial court correctly instructed the jury as to the law applicable to the facts, the Supreme Court is not concerned whether it was given by the court in its own language or in that preferred by counsel.[7]

8. HOMICIDE—ERROR IN INSTRUCTIONS AS TO MURDER NOT MATERIAL WHERE CONVICTION WAS FOR MANSLAUGHTER.

In reviewing a conviction for manslaughter, the Supreme Court will not consider errors assigned on instructions given applicable to the charge of murder.[8]

9. CRIMINAL LAW — SELF-DEFENSE — NOT ERROR TO REFUSE REQUESTED INSTRUCTION COVERED IN GENERAL CHARGE.

Where the charge of the trial court as to self-defense was very explicit, and fully protected the defendant's rights, it was not error to refuse a requested instruction on the subject.[9]

10. SAME—WHERE TRIAL JUDGE ILL HEARING ON MOTION FOR NEW TRIAL BEFORE JUDGE OF ANOTHER CIRCUIT PROPER.

Where, before the hearing on a motion for a new trial was had, the trial judge was taken seriously ill, and defendant's counsel filed an affidavit so stating, it was proper for the hearing to be brought on before the judge of another circuit.[10]

11. SAME—NEW TRIAL—AFFIDAVITS—HEARSAY.

A statement in an affidavit filed by defendant's attorney that a female juror had informed him that she was permitted to retire to a separate room during the deliberations of the jury at night, and that the officer in charge had also so informed him, was hearsay and could not be considered by the court on a motion for a new trial; the proper practice being to call the juror and officer for examination.[11]

12. SAME—THAT JUDGE ATE WITH JURORS NOT REVERSIBLE ERROR IN ABSENCE OF SHOWING OF PREJUDICE.

That the trial judge ate at the same table with the jurors, does not constitute reversible error, in the absence

[6]Criminal Law, 17 C. J. § 3638; [7]Id., 16 C. J. § 2466 (1926 Anno); [8]Homicide, 30 C. J. § 712; [9]Criminal Law, 16 C. J. § 2506; Homicide, 30 C. J. § 618; [10]Id., 16 C. J. § 2731 (1926 Anno); [11]Id., 16 C. J. § 2744.

of a showing that prejudice resulted to the defendant therefrom, although under 3 Comp. Laws 1915, §§ 15833, 15835, it is the duty of the officer in charge not to allow any communications to be made to the jurors.[12]

13. SAME.

Private communications between the court and the jury are improper.[13]

14. SAME—READING TESTIMONY OF WITNESS TO JURY—ABUSE OF DISCRETION.

Where the jury, during their deliberations, returned to the court room and asked to have the testimony of a certain witness read to them, there was no abuse of discretion in allowing it to be read over objection of defendant's counsel thereto unless the testimony of two of defendant's witnesses was also read.[14]

15. SAME—THAT COURT URGED JURY TO REACH A VERDICT NOT REVERSIBLE ERROR.

Where the jury continued their deliberations for several hours after the trial judge called them into court and instructed them that it was their duty to agree upon a verdict and urged them to do so to save expense to the county, and it is apparent that what he said did not bring about the agreement finally reached by them, there was no reversible error therein, although what was said might better have been omitted.[15]

16. SAME—CONVICTION MAY NOT BE SET ASIDE UNLESS RESULT IS MISCARRIAGE OF JUSTICE.

The Supreme Court has no right to reverse a conviction in a criminal case unless satisfied that there was such error committed on the trial as deprived defendant of substantial rights or resulted in a miscarriage of justice.[16]

17. SAME—COERCING JURY BY COURT REVERSIBLE ERROR.

An instruction on the part of the court in a criminal case which may coerce the jury into agreeing upon a verdict constitutes reversible error.[17]

18. SAME—LANGUAGE OF COUNSEL MUST BE RESPECTFUL.

Language used by counsel in briefs, as well as that employed in oral argument, must be respectful.[18]

---

[12] Criminal Law, 16 C. J. § 2560; [13] Id., 16 C. J. § 2560; [14] Id., 16 C. J. § 2560; 17 C. J. § 3587 (1926 Anno); [15] Id., 16 C. J. § 2562; 17 C. J. § 3637 (1926 Anno); [16] Id., 17 C. J. § 3751; [17] Id., 16 C. J. § 2562; [18] Id., 17 C. J. § 3492.

Error to Genesee; Brennan (Fred W.), J.     Submitted January 15, 1925.     (Docket No. 121.)     Decided April 3, 1925.

Sam Kasem was convicted of manslaughter, and sentenced to imprisonment for not less than 5 nor more than 15 years in the State reformatory at Ionia. Affirmed.

*Charles A. Withey* and *Thomas Stockton,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Harry G. Gault,* Prosecuting Attorney, and *William R. Roberts,* Assistant Prosecuting Attorney, for the people.

SHARPE, J.     On June 24, 1923, Amin Kasem and the defendant, his nephew, were engaged in running a hotel and soft drink place in the village of Mt. Morris, in Genesee county.     Between 8 and 9 o'clock in the evening, Alphonse Jacobs, Philip Jacobs, Ernest Jacobs and Alex Barcey entered and asked for drinks. They afterwards had something to eat.     An altercation arose over the charge for the meal.     A chair was thrown, by whom is in dispute.     In the melee that followed, Ernest Jacobs testified that defendant came from an adjoining room and "started shooting." One of the shots hit the witness in the leg.     A witness named Hackney, who heard the disturbance and went into the room, testified that one of the shots fired by the defendant hit Alphonse Jacobs, who "doubled backwards and fell."     Alphonse was taken to a hospital and received the attention of Doctors Randall and Graham.     They discovered that a bullet had entered his back above the waist line, and was then embedded "just over the pit of the stomach." They removed the bullet.     He got along "fairly well for about a week."     His temperature then began

rising.    A "secondary operation" was performed on
July 8th.    He died on July 16th.    Both Amin and
Sam were arrested.    On the examination afterwards
had, Amin was discharged.    Sam was bound over for
trial.    He was convicted of manslaughter, and
sentenced.    He here reviews the judgment of the court
by writ of error.    There are many assignments.

1. It is insisted that there was not sufficient proof
that death resulted from the wound caused by the
bullet.    While Dr. Randall testified that he—

"did not examine the other vital organs at all.    He
may have died from a dozen or a hundred different
causes independent of the gunshot wound"

—he also testified that the gunshot wound was the
"original cause" of death.    Dr. Graham also so testi-
fied in effect.    Their testimony was clearly sufficient
to carry this question to the jury.

2. At the conclusion of the proofs, by agreement of
counsel, the jury were taken to view the premises
where the shooting occurred.    They were unaccom-
panied except by the officer in charge.    On recon-
vening, one of the jurors informed the court that they
had "found another gun there."    A conversation then
occurred as to whether it was the same kind of a gun,
and whether the same kind of cartridge would fit it.
No suggestion of impropriety as to what occurred was
then, or at any time later before verdict, suggested by
defendant's counsel.    Counsel now say:

"The court was certainly wrong in peremptorily ex-
cluding the respondent and his attorneys from being
present."

The record does not clearly disclose by whom the
request was made, nor what was then said by counsel.
The following is all that appears:

"(At this juncture it was agreed that the jury might
go to Mt. Morris and view the premises.)"

The defendant was on bail. We must assume that the arrangement made was agreeable to, if not suggested by, his counsel. The statute (3 Comp. Laws 1915, § 15825) permits the court to order a view of the premises by the jury. There was discussion following the production of the gun found by one of the jurors, and whether the bullet taken from the body of the deceased would fit it.

"*Mr. Withey:* You want to compare this one to see whether it is the same in size?

"*Mr. Gault:* Yes, sir.

"*The Court:* How are you going to do it?

"*The Juror:* I don't think there is any use. I think that that is plain enough just as it is.

"*Mr. Withey:* There is no issue raised on that at all."

Amin Kasem, called as a witness by defendant, had testified that there were two guns, the one produced by the officer and "another gun right back in the place where it is now in the drawer behind the counter." This was the one found by one of the jurors.

The danger of permitting a view by the jury unless accompanied by the judge and the attorneys is here well illustrated. While it is discretionary in the court to order a view, the better practice would seem to suggest that it should be done only in cases where it is uncertain whether the jury have been able to visualize the surroundings from the testimony submitted. *People* v. *Auerbach,* 176 Mich. 23, 46 (Ann. Cas. 1915B, 557).

The juror, however, merely found the revolver he produced in the place where defendant's witness had sworn that it was. It is apparent that defendant's counsel attached no significance to the incident, and we think it in no way affected the verdict of the jury.

3. On cross-examination of Sheriff Rogers by one

of defendant's counsel, he sought to show that Amin Kasem soon after his arrest had made certain statements to him relative to the shooting. An objection to this by the prosecuting attorney was sustained. Amin was later called by the defendant, and testified, without objection, that while in jail he told the sheriff that *he* did the shooting. While counsel assign error on the ruling of the court sustaining the objection, their complaint here is directed to the remarks of the prosecuting attorney in his opening argument to the jury relative to it. He said:

"If you believe that either one of them falsified about that matter and believe several other witnesses in this case, there isn't any other conclusion you can come to in this case, if you base your conclusion on that, I say there isn't any other conclusion you can come to then but that Sam Kasem fired the fatal shot. Now, in discussing that matter you have got to go into it and consider it carefully; you have got to consider in connection with that, I say, the interest of the witnesses. You have a right to consider in connection with that that the respondent, Sam Kasem, and his uncle Amin, told his story for the first time in court when they got up here after they had heard and had a chance to digest all the testimony as related by the other eyewitness of the affair. Now, they did not have to and they did not take the witness stand in the court below, either one of them."

After objection, overruled by the court, counsel proceeded:

"Now, if Amin Kasem knew or thought that these witnesses for the people who testified in the court below and who have testified the same way here were on the wrong track or were mistaken, and there isn't any evidence that they were or that he thought so, why didn't he take the witness stand in the court below and relate the story—

"*Mr. Withey:* I want an exception to that.

"*Mr. Gault*—so that the officers if they wanted to—

"*The Court:* You can have it.

"*Mr. Gault*—could take advantage of the checking up on his story at the trial when this matter was fresh, by making inquiries in the village of Mt. Morris and other places and determine whether or not there might be some truth to his story so that we would know in coming in here right at the beginning."

Both Amin and the defendant were charged in the complaint first made. On examination before the magistrate, there was proof, as here, that the defendant did the shooting. Amin, being in no way connected with the commission of the crime, was discharged. They were both sworn as witnesses on the trial. Amin testified, as before stated, that he did the shooting. Defendant testified that he was not in the room when the first shot was fired, and that he did not know who fired the shots. It was the claim of the prosecuting attorney, as indicated by his argument, that Amin, after his discharge, concluded to take the blame upon himself. Defendant's counsel very ably answered the argument of the prosecutor. We are loath to treat what occurred as reversible error, under the majority holding in *People* v. *Prevost*, 219 Mich. 233.

4. Error is assigned upon the charge. It is said that it consisted largely in reading the prosecuting attorney's requests. The question is: Was the law applicable to the facts properly stated? If so, this court is not concerned with whether given by the court in its own language or in that preferred by counsel. As the defendant was convicted of manslaughter, we do not consider the errors assigned on the instructions given applicable to the charge of murder.

It is urged that defendant's right to defend himself was not properly submitted to the jury. The following was eliminated from one of defendant's requests:

"If Amin was assaulted and struck as he says he was, the shooting was justified and you should acquit."

The charge of the court as to self-defense was very explicit, and fully protected defendant's rights in that respect. It was somewhat difficult to present, owing to the positive denial of both the defendant and his uncle that the defendant had a revolver or fired a shot. After instructing the jury that the defendant might protect himself from danger to his life or "from such serious bodily harm as would give him a reasonable apprehension that his life was in immediate danger," and that "a man may defend his family, his servants, or his master, whenever he may defend himself," he further said:

"So if you find from the evidence in the case and all its surroundings, that the truth on that subject is with the defense, then the shooting was justified, no matter which one of the Kasems did it, because either had a right to protect their domicile, their property and their persons, or the persons of one another to any extent necessary to repel their assailants."

We find no reversible error in the charge as given.

5. Error is assigned upon the denial of defendant's motion for a new trial. Before a hearing on this motion, the trial judge was taken seriously ill and defendant's counsel filed an affidavit so stating. For this reason, the motion was brought on for hearing before Judge Gilbert of the 13th circuit. The practice in this respect was approved in *People* v. *Genesee Circuit Judge*, 227 Mich. 538.

(*a*) One of defendant's counsel filed an affidavit in which he stated that a female juror had told him that she was permitted to retire to a separate room during the deliberation of the jury at night, and that the officer in charge had also so informed him. It is clear that the court could not consider this matter upon such hearsay statement. The juror and officer might have been called and examined on the motion, had counsel so desired. There is no intimation in

the affidavit that the room to which the juror retired was one to which outside parties had access, or that she was not, while absent from the others, in the charge of the officer.    16 C. J. p. 1077.

(*b*) It was also stated in some of the affidavits filed on the motion that the trial judge came into the restaurant where the jurors were brought by the officer for their evening meal and ate his meal at the same table with them, but apart from the general public.    It is unfortunate that the illness of the trial judge prevents us from having before us his version of what happened on this occasion.    The duty of the officer in charge of the jury in such cases is well stated in the oath administered to him by the clerk of the court (3 Comp. Laws 1915, § 15833).    For a violation thereof, he may be adjudged guilty of perjury (§ 15835).    He must "not suffer any communication to be made to them, or any of them, orally or otherwise;" he must "not communicate with them, or any of them, orally or otherwise," except by the order of the court or to ask them if they have agreed upon their verdict.    The writer of this opinion has observed that many officers pay little attention to the oath taken by them forbidding them from conversing with the jury, and has frequently found occasion to reprimand them for so doing.    While going to and from meals, the officer should not converse with the jury, and certainly should not sit at the same table with them while eating.    The usual practice is to have two officers sworn, so that they may relieve each other when necessary.

While there is practical unanimity in the opinion of the courts that private communications between the court and the jury are improper, there is some conflict as to whether such action will nullify the verdict.    We think the better holding, and that supported by the weight of authority, is that there is no presumption

of a violation of duty on the part of the court, and that to constitute reversible error it must be made to appear that prejudice to the defendant resulted therefrom.    The subject is discussed at length in *State* v. *Murphy,* 17 N. D. 48 (115 N. W. 84, 17 L. R. A. [N. S.] 609, note, 16 Ann. Cas. 1133).    See, also, *Dodge* v. *United States,* 169 C. C. A. 316 (258 Fed. 300, 7 A. L. R. 1510) ; 16 R. C. L. p. 294; 16 C. J. p. 1090.

(*c*) During their deliberation, the jury returned to the court room and asked to have the testimony of the witness Hackney read to them.    Counsel for the defendant objected unless the testimony of two of defendant's witnesses was also read.    To this he was not entitled as a matter of right.    There was no abuse of discretion in permitting this testimony to be read.

(*d*) Several affidavits were filed by the defendant stating that after the jury had deliberated for several hours they were brought into the court room and certain instructions given them by the trial judge in the absence of the attorneys and the stenographer.    One affidavit averred that the court said:

"I am going to send you back to your room again and I want you to decide this case as soon as you can.    It is making too much expense to the county."

In another that the court said:

"It was their duty to agree on a verdict and he hoped they would do so as soon as they could, that it had been a long trial, and to try it over again would be a great expense to the county."

In a third the instruction was thus stated:

"That it was their duty to agree upon a verdict; that it was an expensive case, and that if it had to be tried again it would be a still greater expense to the taxpayers.    That he was going to send them out again and he thought they ought to be able to agree upon a verdict."

It was several hours after this instruction had been given that the jury asked to have the testimony of Hackney read.    It is clearly apparent that what had been said by the court did not bring about the agreement finally reached.    *State* v. *Rogers*, 56 Kan. 362 (43 Pac. 256).

In several of the cases hereafter cited allusion is made to the fact that such an instruction is quite as favorable to the defendant as to the prosecution.    If it be claimed that one or more jurors who are unwilling to agree with their fellows are influenced thereby and yield their convictions, they are quite as likely to be jurors holding out for conviction as for acquittal.    The jurors are, of course, aware that criminal trials are expensive and that the taxpayers of the county must bear the expense.    What was said by the court was but a reminder of what they themselves well knew.    It was their duty to agree if possible, and, after many hours of further deliberation, they did agree.    The court in no way intimated to them his opinion as to the verdict they should render. While what was said might better have been omitted, we are forced to the conclusion that, in view of their after discussion, it but induced them to reconsider the testimony and the instructions of the court, perhaps more fairly and with a consciousness that their differences of opinion should be reconciled if possible without the abandonment of a fixed conviction on the part of any juror.

In considering such questions, we are apt to lose sight of the fact that jurors are men of intelligence. They fully understand that they are not mere automatons, charged with the duty of voicing the sentiments or desires of the trial court.    The majority, if not all of them, have a proper conception of their own duty, and of the duty of the court, and will not be ·driven to return a hasty or unjust verdict because

230—Mich.—19.

they might think it in accord with the wishes of the court.    Instructions urging agreement if the jurors could conscientiously do so, and stating that absolute certainty that their verdict was right could not be expected, were approved of in *Commonwealth* v. *Tuey,* 8 Cush. (Mass.) 1; *State* v. *Smith,* 49 Conn. 376, and *Allen* v. *United States,* 164 U. S. 492 (17 Sup. Ct. 154).

We have no right to reverse a conviction unless we are satisfied that there was such error committed on the trial as deprived the defendant of substantial rights or resulted in a miscarriage of justice.    We feel forced to the conclusion that what here occurred does not necessitate a reversal.    This conclusion finds support in our own decisions as well as in those of other courts.

The rule that an instruction on the part of the court which may coerce the jury into agreeing upon a verdict constitutes reversible error seems well established.    *People* v. *Strzempkowski,* 211 Mich. 266 (10 A. L. R. 420), and cases cited.    It is a little difficult, however, to say just what amounts to coercion in such cases.    In 16 C. J. p. 1091 it is said:

"It is proper for the court, after the jury have been deliberating for some time, to recall them to ascertain why they cannot agree, and to inquire as to whether there is any likelihood of an agreement.    Provided nothing is said to coerce an agreement, or to indicate what verdict should be rendered, or that may be considered as an appeal to the jury to decide the case in some way even at the expense of honest convictions, the court may give the jury further instructions or advice calculated to assist them in coming to an agreement; may call their attention to the time taken in the trial and the great expense incurred therein, or which would be incurred by a retrial; may impress upon them the importance of the case and urge them strongly to come to some agreement; may ask them if any one has intruded upon their deliberations or has

attempted to tamper with them; and may direct them
to retire for further consideration."

In 16 R. C. L. p. 298 it is said:

"It is a general rule that the trial court may detail
to the jury such matters as the ills attendant on a dis-
agreement, the expense, the length of time it has taken
to try the case, the length of time the case has been
pending, the number of times the case has been tried,
and that the case will have to be decided by some
jury on the same pleadings and in all probability on
the same testimony."

In *Kelly* v. *Emery*, 75 Mich. 147, the trial court said
to the jury:

"This case has already been tried once, and the
amount involved is not very large, and the parties
cannot afford to litigate it forever, and the county
cannot afford to have them do it.    You see it takes
some time to try the case, and I hope you will be able
to arrive at a conclusion, and settle the facts in the
case, at least."

It was said that this statement "was simply an ad-
monition to the jury to agree, if possible, upon the
facts of the case, and one which the court might very
properly make."    This holding was quoted from with
approval in *Richardson* v. *Railway Co.*, 182 Mich. 206,
and is cited in *Vinton* v. *Township of Plainfield*, 208
Mich. 179.    See, also, *Pierce* v. *Rehfuss*, 35 Mich. 54.

In *Secor* v. *State*, 118 Wis. 621 (95 N. W. 942),
the trial court, when giving additional instructions
to the jury, pointed out the duty imposed on them to
agree if possible and said the case—

"has taken considerable time; it has cost, of course,
considerable money; and it is important and desirable
that, if you can come to an agreement, that you should
do so."

On review in the supreme court, it was said that—

"It would have been better, had the question of expense   *   *   *   been omitted, but we are not ready to say that prejudicial error results therefrom."

In *May* v. *State*, 98 Miss. 584 (54 South. 70), a statement to the jury "that it cost money and time to try cases," when refusing to discharge them on disagreement, was held not to be reversible error.

In *State* v. *Seals*, 135 La. 602 (65 South. 756), the trial court, on being informed by the foreman "that it looked as if they would not be able to agree," said to them, among other things:

"You should not put the parish to the expense of another trial if it is possible for you to agree."

It was held that "There was nothing coercive in the language of the trial judge."

In *State* v. *Gorham*, 67 Vt. 365 (31 Atl. 845), when ordering the jury to further deliberate after they had announced that they could not agree, the court said to them—

"that the trial had occupied five days;   *   *   *   that it was important to the prisoner and to the State that the case should be determined; that it had been quite expensive to the State, and that that expense ought not to be thrown away if it could be avoided; that the court had to have these considerations in mind when a jury asked to be discharged, and that the court thought the jury should have them in mind."

It was held that the court did not intend to, nor did it thereby, inject "into the case the element of expense to the State as a proper matter to influence an agreement."

In *People* v. *Cherry*, 30 Cal. App. 285 (158 Pac. 335), the court said:

"In this same connection, viz., the appellant's contention that the jury were coerced into their verdict, it is true that the court did, in urging the jury to reach a verdict, refer to the time consumed in the trial

and the large expense incurred therein; but there is nothing in the record which warrants the assertion that the jury were unduly urged or at all coerced into rendering their verdict against the defendant. The court said nothing to indicate what the verdict should be. Its remarks were fair and guarded, and were made for the commendable purpose of having the jury labor honestly and faithfully to arrive at a verdict if possible, and thus terminate the litigation. This did not constitute error."

In *Johnson* v. *State,* 60 Ark. 45 (28 S. W. 792), the trial court, after the jury had been out several days, said to them:

"This cause has been a great expense to the county from which it came, and it ought to be decided; and while I do not ask you to yield any question of conscience, you must not be obstinate or too tenacious of your views."

It was held that the court merely "sought to impress them with the importance of a decision," and "did not ask them 'to yield up any question of conscience.' "

In *Territory* v. *King,* 6 Dak. 131 (50 N. W. 623), it was held (syllabus) that instructions, including the following:

"I think you will be able to arrive at a verdict in this case; the case has been twice tried at a great deal of expense to this county, and it seems to me, gentlemen, that you ought to agree on a verdict"—

"while these remarks were objectionable, they would not warrant setting aside the verdict."

In *People* v. *Miles,* 143 Cal. 636 (77 Pac. 666), the court, among other things, said to the jury:

"It costs several hundred dollars to get a jury together to try a criminal case. It is an expensive matter. * * * If you think there is any possibility of arriving at a verdict, and thus saving the county the expense of a retrial, I am willing to read the instructions to you again."

It was held that:

"In reminding the jury of the expense of the trial, and the desirability to them as taxpayers of avoiding a repetition of this expense, was saying no more to them than they as taxpayers and intelligent men must be presumed to have known without being told by the court. * * * It was proper for the court to urge the importance of reaching a verdict, and as it intimated no opinion of its own or suggested how the verdict should go, the defendants were not prejudiced."

In a note to *State* v. *Place*, 11 Ann. Cas. 1129, at page 1134, the annotator, after citing the holdings in all our State courts, including the Michigan cases heretofore referred to, says:

"In some cases the trial judge has been criticized, and in others reversed, because he impressed upon the jury the importance of coming to an agreement. However, the general rule is that the trial court may detail to the jury the ills attendant upon a disagreement, the expense, the length of time it has taken to try the case, the length of time the case has been pending, the number of times the case has been tried, and that the case will have to be decided by some jury upon the same pleadings and in all probability upon the same testimony."

A later note will be found in Ann. Cas. 1915D, at page 675. Later cases are therein cited and quoted from. The general rule is said to be the same as announced in 11 Ann. Cas. 1134.

The assignments not here discussed have been carefully considered. In view of the length of this opinion, it is sufficient to say that they do not present any reversible error.

Our attention is called to certain aspersions on the conduct of the court and the prosecuting attorney by counsel for defendant in their brief. In the language of Mr. Justice Brewer in *Kneeland* v. *American Loan & Trust Co.*, 138 U. S. 509 (11 Sup. Ct. 426):

"It is not pleasant to be compelled to remind counsel that language used in briefs, as well as that employed in oral argument, must be respectful."

The judgment is affirmed.

BIRD, MOORE, STEERE, and WIEST, JJ., concurred. McDONALD, C. J., and CLARK and FELLOWS, JJ., concurred in the result.