[Civ. No. 18884.   Second Dist., Div. One.   July 21, 1952.]

Estate of MARGARET FAMA, Deceased.   TONY JOHN FAMA, Appellant, v. MARY KANTER, Respondent.

Adler, Flinkman & Hahn for Appellant.

Waterman, Robbins & Kilpatrick for Respondent.

DRAPEAU, J.—Margaret Fama died on June 14, 1950. She had been married twice and was survived by nine children: six by the first marriage and three by the second.   She left a will dated August 3, 1949, in which she devised her entire estate to a daughter of her first marriage, to wit: Mary Kanter.   By a later will dated February 23, 1950, she left her entire estate to her two youngest sons, Tony John and Joseph Fama.

By his petition of July 24, 1950, Tony John Fama presented for probate the will of February 23, 1950, which was executed by mark.   Petitioner's half-sister, Mary Kanter, filed a contest to the probate of said will on the grounds of fraud, undue influence, lack of execution and incompetency.

At the conclusion of the trial, the court directed the jury to bring in a verdict "finding Mrs. Fama was of sound and disposing mind on February 23, 1950."   The other issues were submitted to the jury on written interrogatories, to wit:

"1. Did Margaret Fama place her cross on the will dated February 23, 1950."

"2. Did Margaret Fama understand the provisions of said will."

"3. Did said will express the intentions of Margaret Fama with respect to the disposition of her property."

"4. If you find that Margaret Fama did place her cross on said will, was she at the time acting under the undue influence of Tony John Fama."

The jury unanimously answered the first three questions in the negative and left the fourth question unanswered.

Before accepting the verdict it was agreed by counsel for both sides that it was satisfactory in the form rendered without an answer to the fourth question.

Judgment was entered accordingly. Thereafter the court denied petitioner's motion for a new trial on the ground that the "moving party failed to comply with Rule 3-b of the Judicial Council Rules."

Petitioner appeals from the judgment. He also appeals from the order denying his motion for a new trial. The latter is a nonappealable order and therefore should be dismissed. However, the order is reviewable on the appeal from the judgment. (*Lee* v. *Dawson,* 44 Cal.App.2d 362, 364 [112 P.2d 683].)

Respondent, the contestant, presented evidence that on February 23, 1950, Mrs. Fama was 65 years of age, suffered from diabetes and had very poor eyesight; that she spoke Italian and "very little English . . . not enough to hold any conversation." Also, that on the day in question, appellant took his mother to look at a liquor and grocery store which he said he might buy. She was wearing a dark house dress and no hat. When he brought her home she was carrying a gallon jug partly filled with wine, and said that Tony had given her some wine to drink.

Appellant testified that on February 23, 1950, his mother said she wanted to see an attorney. Appellant knew no attorneys but his wife's mother and father had a lawyer named Adler, so his wife made an appointment with him. Early in the afternoon, appellant called for his mother and took her to Mr. Adler's office. They had to wait a while because Mr. Adler was busy. And then "My mother did all the talking" to Mr. Adler, who drew up a will which he read to her. She signed by mark, Mr. Adler and his secretary signing as witnesses. She gave the will to appellant and he took her straight home. He placed the will in his safe deposit box and on June 14, 1950, his mother died.

Mr. Adler testified that a woman wearing a dark coat and a scarf on her head, accompanied by appellant came to his office on February 23, 1950 and said "I am Mrs. Fama and I want to make a will"; that appellant referred to her as "mama." Neither Mr. Adler nor his secretary, Eloida R. Aguerrebere could speak Italian so Mrs. Fama conversed in English. She gave him the names of her children and said she wanted her sons Tony and Joe to receive everything she had. Mr. Adler then prepared the will and Mrs. Fama signed with her mark and he and his secretary witnessed the same.

Four photographs were submitted to Mr. Adler and he selected the one which he thought closely resembled the woman who signed the will in his presence. The contestant, Mary Kanter, then testified that this was not a picture of the decedent. Thereafter, appellant introduced in evidence four snapshots taken in 1948, and a photograph, all of which were identified by contestant as pictures of her mother, the testatrix.

From this point, the question of the identity of the testatrix became the main issue, it being contended by contestant that the woman who placed her mark on the will of February 23d was not Mrs. Fama but an imposter.

Upon direct examination, Mrs. Aguerrebere, one of the witnesses to the will, testified that "Tony Fama and his mother, Dominica Fama, came into the office. They waited for Mr. Adler. Mr. Adler wasn't there. They waited some time and Mr. Adler came in. They walked into the office with him and they were in there some time. . . . And when he was ready to dictate, he called me in, he dictated the will, and he asked her—he usually asked them if that's all they want in there, if there is anything else that they want to add or they want to change, so we don't have to retype the will.

"She said, 'All right, it is all right, it sound all right,' and then I walked out and I typed out the will. I came back and handed the will to Mr. Adler. Mr. Adler read the will over to her in English. He read it over slowly, and then Mr. Adler said, 'I told you that you needed two witnesses, and my secretary and I shall act as witnesses and will be your witnesses,' so she took the pen. She put her cross there, and Mr. Adler said, 'Sign this as your last will and testament. You know what you are doing?'

"She said, 'I do,' and I took the pen and signed my name

and gave it to Mr. Adler and Mr. Adler signed his name, and Mr. Adler handed her the will in a sealed envelope, and she walked out. That's all there is to it.

"Q. Mrs. Aguerrebere, at that time, did you hear Mr. Adler ask her if there was anything else that she wanted to say about the will after I dictated it to you?

"A. After you dictated it, you asked her if that was all right, and she said, 'All right, it is fine.' "

On cross-examination, contestant's attorney attacked this witness' recollection of what occurred on the day the will was executed and attempted to impeach her by showing inconsistent statements. The witness denied having made the statements attributed to her. After submitting the question to the reporter's notes, contestant's counsel withdrew the question with the comment: "*I will leave it to the Jury's recollection of the matter.* The Court: If you withdraw the question, that's that."

An examination of the record discloses that the jury was not present when this witness first testified regarding the formal execution of the will, and further, that she did not impeach herself by any inconsistent statements or otherwise.

Mrs. Aguerrebere was recalled as a witness in surrebuttal on behalf of the appellant, when the following took place outside the hearing of the jury:

"Mr. Adler: At the time when he (respondent's attorney) was questioning her, . . . he asked her about the alleged, supposed will. In other words, it was the first time that that word was used. Now, that's before the Jury, the, allegedly, will.

"Mr. Robbins: I think we should have the right to see if she can make any identification of anyone that was in the place at that time.

"The Court: You should have asked her afterwards. I think this is not proper now.

"Mr. Robbins: She testified again before the Jury.

"The Court: No argument is necessary.

"Mr. Adler: May I ask the Court to reopen the case to replace Mrs. Aguerrebere on the stand for the purpose of questioning her as to the identity?

"The Court: You mean from those pictures?

"Mr. Adler: From those pictures. I think we should be permitted to do that in justice to the parties. They showed up with pictures, and showed me one picture and asked me if that was the woman, and I picked out one picture for

Mary (the contestant) and she said it wasn't. I am going to ask the Court to be permitted to reopen the case in chief for the purpose of permitting Eloida Aguerrebere to testify for identification purposes.

"Mr. Robbins: She can't identify anything. She didn't know the party, if the Court please. In picking out any picture, she wouldn't identify anybody.

"Mr. Kilpatrick: We object to that as improper, and on the ground that counsel was informed yesterday of the contention that the person in his office wasn't the true Mrs. Fama. I personally told that to counsel, that we were going on that theory. . . .

"Mr. Robbins: If this witness had testified she was personally acquainted with Mrs. Fama, she could testify it was Mrs. Fama. All she can testify is that on a certain day a woman called at the office.

"Mr. Adler: She can testify what picture, in her opinion——

"Mr. Robbins: We are objecting that is not proper rebuttal.

"The Court: I have ruled it isn't proper rebuttal. He asked to reopen the case. I think the motion will be denied."

Appellant here urges that the court abused its discretion in denying the motion to reopen the case to present further evidence of identification of the testatrix.

"While a court has a wide discretion in passing upon such a motion this discretion should be exercised in accordance with legal principles and in accordance with the ends of justice. A trial in a court of justice is not a game and the judge is more than an umpire." *Christina* v. *Daneri,* 22 Cal.App.2d 190, 193 [70 P.2d 983].

This witness had not previously been asked to identify the pictures, hence the offered proof was material and might have compelled a decision the other way.

The pictures were before the jury and the contestant had pointed out which were pictures of her mother, the testatrix. Mrs. Aguerrebere should have been permitted to testify whether the person who executed the will on February 23, 1950, was the same person shown in the various photographs, who had been acknowledged by contestant to be the testatrix.

Under the peculiar circumstances here existing the case should have been reopened in order to permit justice to be done and, in our opinion, the failure to grant the motion was an abuse of discretion. This, coupled with the prej-

udicial remarks of counsel in his attempted impeachment of the witness, amounted to a miscarriage of justice.

Because of the conclusion reached, it is not necessary to pass upon the other points raised in this appeal.

The appeal from the order denying motion for new trial is dismissed. The judgment is reversed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied August 13, 1952, and respondent's petition for a hearing by the Supreme Court was denied September 18, 1952. Carter, J., was of the opinion that the petition should be granted.