STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUSSELL GEORGE WOLF, DEFENDANT-APPELLANT.

Argued January 18, 1965—Decided March 1, 1965.

*Mr. Sheldon A. Weiss* argued the cause for defendant.

*Mr. Gregory J. Castano,* Assistant Prosecutor of Hudson County, argued the cause for plaintiff (*Mr. James A. Tumulty, Jr.,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendant Wolf was convicted of murder in the first degree in the Hudson County Court and was sentenced to life imprisonment in accordance with the recommendation of the jury. He appeals directly to this Court. *R. R.* 1:2–1(c).

## I.

The conviction was based upon a finding that Wolf participated with one Robert O'Connell in the commission of an armed robbery on November 4, 1960, in the course of which the victim, Dr. Max Pascher, a Union City, New Jersey dentist was shot and killed. The thesis of the State was that O'Connell entered the doctor's office and committed the robbery and killing, while Wolf, who had planned the crime and furnished the gun used by O'Connell, remained outside on the public street waiting for him.

O'Connell pleaded *non vult* to the indictment for murder and testified for the State at the trial. He was the principal witness against Wolf who denied participation in the robbery. According to Wolf, O'Connell talked to him at his hotel in Newark, New Jersey on November 3, 1960 about holding up the doctor who might have one or two thousand dollars in his possession. Wolf expressed doubt that the doctor would have so much money on his person, but agreed to go along with O'Connell the following day to look over the place.

Early in the afternoon of November 4, O'Connell and Wolf appeared in the vicinity of Bergenline Avenue and 49th Street in Union City where Dr. Pascher's office was located. O'Connell was carrying a satchel containing a gun, a pair of gloves, a roll of adhesive tape and some nylon stockings. The satchel and contents, he said, were supplied by Wolf on the morning of November 4 at the apartment of a Mrs. Ruth Ortiz, a friend of O'Connell, in the presence of Mrs. Ortiz and his brother, James O'Connell. Wolf denied furnishing the satchel, its contents or the gun. He insisted the articles belonged to Robert O'Connell. Mrs. Ortiz testified for the State that she saw Wolf bring the bag into her apartment. James O'Connell corroborated her and in addition said he looked into the bag and saw a gun there.

According to O'Connell, Wolf, who had planned the robbery, pointed out the doctor's office and said he would wait on 48th Street ["to cover my back"] while O'Connell com-

mitted the holdup. O'Connell undertook to do so, met with some resistance and shot and killed the doctor. Then he took what money the dead man had on his person. On returning to 48th Street, he handed to Wolf the bag containing the gun, the other articles already referred to and the victim's wallet (from which he had extracted $20). The men then separated, having agreed to meet later at Wolf's hotel in Newark, New Jersey.

Wolf admitted going to Union City with O'Connell before the holdup to look the situation over. But he testified that on seeing the doctor's office he scoffed at the idea of realizing a substantial sum from a holdup there and said he would have nothing to do with it. He maintained he left O'Connell and went to a bar where he remained for an hour or so before returning to Newark.

O'Connell was arrested on December 31, 1960 and implicated Wolf who was then picked up by the police on January 2, 1961 and brought to Union City police headquarters at about 2:30 p. m. on that day. After learning that O'Connell had admitted the crime and had involved him, Wolf confessed and his confession was completed and signed by him around 11:45 p. m., about nine hours after his arrest. At the trial he repudiated the confession asserting it was untrue and the product of police brutality and coercion.

There were no eyewitnesses to the holdup or the murder. According to the State, O'Connell and Wolf were the sole participants. Although the prosecution adduced some independent testimony of an inculpatory nature against Wolf, it is apparent that the principal witness against him was O'Connell. Thus a decision by the jury as to the truthfulness of the two men was of great importance.

Separate indictments were returned against Wolf and O'Connell charging each of them with the felony murder of Dr. Pascher. Both pleaded not guilty. On May 5, 1961 O'Connell changed his plea to *non vult* and agreed to testify for the State. At the trial of Wolf, which began on June 12 and ended on June 24, O'Connell testified that Wolf was the

instigator and planner of the robbery, that he supplied the satchel containing the loaded gun and other articles described above, waited on the street while O'Connell perpetrated the crime, and then he took the satchel, including the murder gun and the doctor's wallet to his hotel in Newark.

On cross-examination it developed that shortly after O'Connell was arrested on December 31, 1960, he admitted participating in the holdup with Wolf. At that time he said, however, that he accompanied Wolf into Dr. Pascher's office but that Wolf carried the gun and fired the fatal shots. Then at 6:30 P. M. on January 2, 1961 O'Connell changed his version of the affair and signed a statement admitting that he went into the office alone carrying the gun (which had been furnished by Wolf) and in the course of the robbery shot and killed the doctor. He said further that Wolf remained outside and waited for him in accordance with their plan.

Direct examination by the State produced O'Connell's admission that on February 10, 1961 while he and Wolf were confined to the same jail, he managed to send the following letter to Wolf:

"Russ,

I have a few ideas and want your opinion. If you want to beat this I'm sure it can be done.

I'm going to plead not guilty and refuse any lesser charge (they may offer 2nd degree). I'm pretty sure you are going to do the same. Jimmy sent me down word that he won't testify against us and without his testimony there isn't much of a case. I'm going to see him next Sunday in church and tell him that if he does testify I am going to do the following: (1) say that he was in on it (2) say that you wasn't (3) say that he is a spurned lover and is trying to get rid of me (4) he implicated you because he knew there was two people involved, that you had a record and that we knew and disliked each other (5) say that the gun was his and that he had it when I came out of prison as he showed it to me my first night out and say that he was my partner in the Newark hold-up.

Ruth is coming up to see me in a couple of weeks (she writes every day) and I'm going to tell her to say that she never saw you before my arrest and that you was never up her house. As far as I know you don't know her address. I'm going to tell her to say that she saw me with a automatic pistol not a revolver. As far as Joy goes she was jilted & wanted revenge. Either way you'll be covered. I can't see any reason for you to do time because of him.

Let me know what you think of it. If you have any better ideas and feel like it, let me hear them. If we fight this together we can beat it but if we have two different stories in court we're both going. If you try shifting any weight I swear to Christ you'll come with me.

Bob

Let me know if your going to stand alone or not."

The "Jimmy" referred to is O'Connell's brother; "Ruth" is Mrs. Ortiz.

The prosecutor handed the letter to defense counsel who had it marked D-1 for identification. Defense counsel went over it line by line in cross-examination. O'Connell admitted having written it.

Cross-examination further disclosed that on May 23, 1961 he had the following letter delivered by some means to Wolf:

"May 23, 1961

Russ,

You can hold this letter and use it as part of your defense as I have just talked to my lawyer and his son and told him the truth.

I explained to him that I made a score and bought the gun off some guy (I refused to say who) and that I met you on the morning of the murder and we went to Union City together. I asked you in the bar to pull a score with me and you refused. We left the bar and split up. I went to Dr. Pachers office, and killed him. I don't know where you was and I hope you can prove it at the trial.

I'm not telling the truth for your sake Russ as I still hate you. I only hope you have enough sense to realize I don't want your kids to be fatherless because of my lies.

Bob."

This letter was marked D-2 for identification. Both D-1 and D-2 were offered in evidence during the cross-examination. The prosecutor said he had no objection but made the suggestion that a more appropriate time for the offer would be during the defense. The suggestion was accepted but through some inadvertence the offer was not renewed. In any event, O'Connell was examined on the letter line by line so, as with D-1, its contents appear in the record.

O'Connell admitted writing the letter but insisted the facts indicating Wolf's innocence were untrue. He said he wrote it because he wanted to take the entire blame for the crime him-

self and that he told his lawyer he wanted to die. He intended to take the stand, testify against himself and say Wolf was not involved. Since Wolf had children, he wanted to save him. But he changed his mind before trial and decided to tell the truth which was in accord with the testimony he had just given.

The introduction of testimony by State and defense was completed on the afternoon of June 22, 1961. Recess was taken then, the closing arguments to begin the following morning. On Friday, June 23, before the summations began, defense counsel told the court he would like a side-bar conference. The court agreed and a discussion followed, the content of which was not taken by the reporter. At its conclusion defense counsel was instructed to proceed with his summation. The closing arguments were made and the trial judge announced he would charge the jury at 10:00 A. M. the next morning, Saturday, June 24.

The recollections of the trial judge and defense counsel are not in agreement as to what was said at the side-bar conference. On the later motion for a new trial counsel testified:

"Prior to the summation, before the court convened that morning, Mr. Russell Wolf informed me that Robert O'Connell * * * yelled down in the jail that he desired to come over to the court, and he wanted to change his testimony, and he wanted to make it the same as it was—that he had stated in the letter which he had written to Wolf while he was confined to jail. I then went up to court and told the Court what Mr. Wolf had told me."

Counsel then added that the court directed him to take the matter up after summations that day. He did so and was asked to bring it up the next morning. The following morning he inquired of the court clerk whether the judge wished "to discuss the question of Mr. O'Connell coming back on the stand." The reply from the court was that he "would take it up after the charge to the jury." In his subsequent opinion on the application for a new trial, the judge wrote that he had no recollection of any intimation by defense counsel of a recantation by O'Connell.

In any event, on June 24, after the jury had been charged and sent out to deliberate, the defense attorney and the defendant Wolf approached the bench and counsel said that as he had advised the court the previous day, "the defendant informed me that Robert O'Connell had screamed down from 2-N in the jail to 1-N and stated that he wanted to come back to court and change his testimony." Wolf confirmed the statement. The court, however, indicated his recollection of the previous day's statement was that "defendant had informed [counsel] that Robert O'Connell had yelled out to him that Robert O'Connell had framed him." At this point Wolf interjected that O'Connell had said he wanted to come back to court and change his testimony because the letter he had written to Wolf was true. Defense counsel then indicated plainly his feeling that O'Connell should be brought before the jury and interrogated to determine the truth. The trial judge declined to recall the jury, saying he would conduct an inquiry the following Monday. Apparently he felt he had no authority to reopen the case for further testimony after the jury had been charged and had retired to deliberate. After the jury had been out for some time, they sent a note to the judge asking for D-1 and D-2 for identification, O'Connell's two letters to Wolf, which are set forth above. At first he refused saying the documents were not in evidence. Then when his attention was called to the fact that O'Connell had been cross-examined fully on the contents of the letters, he recalled the jury and told them they would have to rely upon their recollection as to what the questioning of O'Connell had disclosed of the subject matter of the letters. After about five hours of deliberation, the verdict of guilty of murder in the first degree with the recommendation of life imprisonment was returned. Such a sentence was imposed immediately.

■■ We pause at this juncture to indicate that under the somewhat bizarre circumstances of the case, and the obvious bearing the letters had on the issue of credibility as between O'Connell and Wolf, fair exercise of the trial judge's discretion required more in answer to the jury's request than simply

advising them to rely upon their recollection of the cross-examination of O'Connell relating to the contents of the letters. It would have been entirely proper and, in fact, advisable for the judge to call upon the court reporter to read the cross-examination to the jury. Since the letters were referred to line by line therein and were obviously of importance to the jury in their deliberations, manifestly such procedure would have satisfied the purpose of their inquiry.

█ █ It should be remembered that the reading of all or part of the testimony of one or more of the witnesses at a trial, criminal or civil, at the specific request of the jury during their deliberations is discretionary with the trial court. *Higgins v. Polk*, 14 *N. J.* 490, 493 (1954); *State v. Ciniglio*, 57 *N. J. Super.* 399, 403 (*App. Div.* 1959). When a jury retires to consider their verdict, their discussion may produce disagreement or doubt or failure of definite recollection as to what a particular witness said in the course of his testimony. If they request enlightenment on the subject through a reading of his testimony, in the absence of some unusual circumstance, the request should be granted. The true administration of justice calls for such action. Where there is a doubt in the minds of jurors as to what a witness said, it cannot be prejudicial to anyone to have that doubt removed by a rehearing of his testimony. There is no need to be chary for fear of giving undue prominence to the testimony of the witness. If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. It must be assumed also that if they had any similar doubts or disagreements about statements of other witnesses they would seek the same remedy. If they do not ask for further reading there is no right in a party to demand it. The matter must be left in the sensitive discretion of the trial judge. He may inquire if they wish to hear the testimony of any other witness, whether or not a party suggests it. But he should not

burden a jury with unnecessary reading they do not indicate a need to hear, and it is not error to decline to read further portions of the evidence simply because a party so demands. But generally where the testimony is reasonably available, a judge should not refuse to grant a jury request to have it read merely because the reading would take time. In these days when the purpose of our procedure is full, fair and free exposure of all relevant evidence in a case both before and during the trial, there is no just reason for insisting that laymen jurors must have an unfailing and unanimous memory of all the testimony they hear in the courtroom. There should be substituted for any seeming hesitancy in the past (*cf. State v. Richter*, 21 *N. J.* 421 (1956)), the enlightened discretion of our trial judges. See, *e. g., State v. Ciniglio, supra; United States v. Rosenberg*, 195 *F. 2d* 583, 598 (2 *Cir.*), *cert.* denied 344 *U. S.* 838, 73 *S. Ct.* 20, 97 *L. Ed.* 687,; *Sobell v. United States*, 344 *U. S.* 838, 73 *S. Ct.* 21, 97 *L. Ed.* 652 (1952); *United States v. Compagna*, 146 *F. 2d* 524, 528 (2 *Cir.* 1944), *cert.* denied 324 *U. S.* 867, 65 *S. Ct.* 912, 89 *L. Ed.* 1422 (1945); *State v. Palmer*, 173 *Kan.* 560, 251 *P. 2d* 225 (*Sup. Ct.* 1952); *People v. Chivas*, 322 *Mich.* 384, 34 *N. W. 2d* 22, 25 (*Sup. Ct.* 1948); *State v. Vallee*, 137 *Me.* 311, 19 *A. 2d* 429, 431 (*Sup. Jud. Ct.* 1941); *State v. Strable*, 228 *Iowa* 886, 293 *N. W.* 441 (*Sup. Ct.* 1940); *People v. Kasem*, 230 *Mich.* 278, 203 *N. W.* 135 (*Sup. Ct.* 1925); *Byrd v. State*, 90 *Tex. Cr. R.* 418, 235 *S. W.* 891 (*Cr. App.* 1921); *Barton v. State*, 72 *Fla.* 408, 73 *So.* 230 (*Sup. Ct.* 1916); *Commonwealth v. Bolger*, 229 *Pa.* 597, 79 *A.* 113, 117 (*Sup. Ct.* 1911); *State v. Perkins*, 143 *Iowa* 55, 120 *N. W.* 62, 21 *L. R. A., N. S.*, 931 (*Sup. Ct.* 1909); *People v. Smith*, 3 *Cal. App.* 62, 84 *P.* 449 (*Ct. App.* 1906); 5 *Wharton, Criminal Law & Procedure*, § 2110, *p.* 291 (1957); Annotation, 50 *A. L. R. 2d* 176 (1956).

Returning to the narrative of events at the end of Wolf's trial, it appears that O'Connell sent two letters dated June 23 and 24, 1961 to the trial judge in which he repeated his desire to recant and testify as to Wolf's innocence. Although

they purport to have been written before the jury returned its verdict against Wolf, they are stamped as having been received at the Hudson County Jail on June 28 and by the trial judge on June 29. It seems plain from a reading of the colloquy between the judge and counsel after the case had been submitted to the jury on June 24 that the judge had not seen the letters at that time. He so certified in his later opinion on the motion for a new trial. No inquiry was made nor was a hearing held, on his own motion or otherwise, on the attempted recantation until the following week, June 30, 1961, when O'Connell appeared for sentence on his *non vult* plea to the charge of murdering Dr. Pascher. At that time, before imposing sentence, the judge asked counsel for O'Connell if he had any objection to putting his client on the stand to answer some questions about the matter. Counsel agreed and his client then said under oath that before the summations at the Wolf trial he had called to Wolf from his jail cell to bring him back as a defense witness. He did so because he had decided to lie to save Wolf. He was under pressure to do so, not from public officials, but he refused to say if it was being exerted by fellow prisoners.

The court inquired about the letters of June 23 and 24, 1961 which asserted Wolf's innocence. O'Connell said they too were false and the result of intimidation by persons he refused to name, although he repeated that the officials were not responsible for it. And he insisted his testimony at the trial concerning Wolf's participation in the robbery-murder was true.

Sentence of a minimum of 22 years and a maximum of 25 years in State Prison was then imposed. Under *N. J. S.* 2A:113-3 and 4, on a plea of *non vult* to this indictment for murder, sentence of life imprisonment or the same as that for a conviction of second degree murder could have been visited on O'Connell. The maximum term for second degree murder is 30 years. O'Connell had admitted guilt of a vicious, deliberate killing in the course of a robbery, and then had undertaken to play fast and loose with the State to serve his own

interest. We find little justification for such a moderate sentence on this chameleon-like criminal.

On September 11, 1961 O'Connell wrote the trial judge seeking a reduction in his sentence. In the letter he said he had testified for the State because he did not want Wolf "to have the opportunity to ruin another person's life as he has ruined mine." He said also that he wrote the two letters of June 23 and 24, 1961 attempting to exonerate Wolf because of intimidation by two "officials of the Hudson County Jail" (whom he declined to name).

Wolf filed a notice of appeal from his conviction on December 27, 1961. On April 17, 1962, while the appeal was pending, O'Connell executed an affidavit again recanting his trial testimony against Wolf. Thereafter, on application, we remanded the record to the trial court so that a motion for a new trial could be made and an appropriate hearing held thereon.

After the remand the motion for new trial took two avenues. Defendant argued that upon being informed before and after the charge to the jury of O'Connell's reference to having framed Wolf or to his desire to be recalled to the witness stand so as to recant his implication of Wolf in the homicide, the trial judge should have recalled the jury and permitted the further testimonial examination of O'Connell. The failure or refusal to do so, he claimed, was prejudicial error and required a new trial. He contended also that O'Connell's testimony taken on the new trial hearing which recanted his trial statements against Wolf constituted newly-discovered evidence and necessitated a new trial. A new trial was denied, however, and the proceedings on the motion were added to the record on appeal before us. For purposes of the appeal we find it necessary to consider only the first reason advanced below as the basis for a new trial.

In denying a new trial the court expressed the view that no authority existed which would permit reopening of the proceedings for further testimony after the jury had been charged and retired to deliberate upon a verdict. Even if

there were no law on the subject and the problem were one of novel impression, it is inconceivable that our trial process could be so rigidly circumscribed. Suppose while the jury was deliberating, the prosecutor returned to court with a third person who had just confessed to the shooting, and with some reputable eyewitness to the killing who identified such person as the perpetrator, could it be said the court was powerless to reopen the defense and permit the jury to hear the new testimony? But we do not have to speculate. There is ample authority to permit recalling the jury in proper circumstances to receive further material evidence.

In *State v. Duncan*, 102 *Utah* 449, 132 *P. 2d* 121 (*Sup. Ct.* 1942), defendant was convicted on an automobile hit-and-run charge. The defense was an alibi to the effect that on the night in question defendant was at a ballroom between 9:15 and 10:45 P. M. The deputy district attorney "practically" conceded Duncan was at the ballroom until 9:45 P. M. After the jury had been charged and retired to deliberate, a witness who had been subpoenaed by the state, but who was not called to testify, approached defense counsel and told him that he operated the automobile which was immediately behind the car which struck the injured man. When he saw what happened, he parked immediately in order to render assistance to the injured man. He advised counsel he had an appointment which he was interested in keeping and that on parking the car he looked at his watch to ascertain the exact time; it was 9:40 P. M. The defense attorney immediately informed the court of what the witness had volunteered, and moved to recall the jury and reopen the case to take his testimony. The trial court denied the motion "on the assumption that it had no authority to recall the jury after the jurors had retired for deliberation in the effort to arrive at a verdict." 132 *P. 2d*, at *pp.* 123–124. The jury returned a verdict of guilty.

Thereafter, defendant moved for a new trial based on the statements volunteered by the witness. Denial of the motion was held on appeal to be an abuse of discretion. And, with respect to the application to reopen the case during the de-

liberations of the jury, the Supreme Court said that since the trial judge had the right to grant a new trial, he also had the right to reopen the case to enable the defendant to use the new witness's testimony. It said also:

"The purpose of a trial is to obtain the facts. If testimony is available which would tend to show the innocence of a defendant, the court and counsel for both sides should aid in the presentation of such testimony to prevent a miscarriage of justice. The jury should be aided in every reasonable manner to obtain all of the competent material and relevant facts essential to enable the jurors to determine the guilt or innocence of the accused. The mere fact the jury has retired to deliberate is unimportant if it becomes apparent the jurors did not receive all of the essential facts. The court has a right to recall them if they have not already brought in a verdict." 132 *P. 2d*, at *p.* 125

The court went on to say the trial judge had the discretionary power to reopen the case and under the circumstances present it was his duty in the interest of justice to do so; if he had done so "it is possible this case might not have reached this court."

In *Elkins v. Commonwealth*, 245 *Ky.* 199, 53 *S. W. 2d* 358 (*Ct. App.* 1932), the defendant was indicted for violating the liquor law. At the trial there were but two witnesses, one for the state, and the defendant. The issue was substantially one of credibility between the two men. After the jury had been charged and retired to deliberate, defendant's attorney learned for the first time there were two persons in the courtroom who had heard the state's witness say that a third person had promised him some money if "he indicted Elkins," that he "indicted" him to get the money, which the third person later refused to pay, and that Elkins did not in fact have any liquor. An immediate application was made to recall the jury in order to permit further cross-examination of the state's witness, and to impeach him by the newly-discovered testimony if he denied the statements. The trial court refused to reopen. An appeal resulted in reversal of the conviction, the Court of Appeals holding that the refusal was an abuse of discretion. Emphasis was placed on the fact that the case

was a close one and that it was obvious that any evidence tending to impeach either of the two principal witnesses would have great weight with the jury. And in this connection the court attached considerable significance to the additional fact that after the jury had been out for a while they reported they could not agree, but the trial judge sent them back for further deliberations. See, also, *State v. Menke*, 25 *N. J.* 66, 70 (1957); *Carlo v. Okonite-Callender Cable Co.*, 3 *N. J.* 253, 263 (1949); *Braden v. Lewis*, 119 *Cal. App.* 2d 84, 259 *P.* 2d 16 (*D. C. App.* 1953); *In re Fama's Estate*, 112 *Cal. App.* 2d 309, 245 *P.* 2d 1101 (*D. C. App.* 1952); *In re Canterbury's Estate*, 224 *Iowa* 1080, 278 *N. W.* 210, 213 (*Sup. Ct.* 1938); *Steffanos v. State*, 80 *Fla.* 309, 86 *So.* 204, 205 (*Sup. Ct.* 1920); *Orfielu, Criminal Procedure From Arrest to Appeal*, p. 466 (1947); Annotation, 87 *A. L. R.* 2d 849, 851 (1963); 53 *Am. Jur., Trial*, § 128; 23 *C. J. S. Criminal Law* § 1055, p. 1232.

The authorities are plain that in a civil or criminal case the trial court has discretion to reopen a case for the introduction of additional evidence while the jury is deliberating upon its verdict. No hard and fast rule for the guidance of his discretion can be laid down. Obviously at that late stage of the proceedings the action should not be taken lightly. It seems sufficient to say that when a citizen's life is at stake a trial in a court of justice is not a game and the judge is more than an umpire. And so, when the ends of justice will be served by a reopening, it ought to be done. *Braden v. Lewis, supra* (259 *P.* 2d. at *p.* 19); *In re Fama's Estate, supra* (245 *P.* 2d, at *p.* 1104).

In the present case basically the fulcrum on which the issue of guilt had to rest was the choice between the credibility of O'Connell and Wolf. Undoubtedly an effort to resolve that problem motivated the return of the jury to the courtroom to request the O'Connell letters concerning Wolf's participation in the crime. On the whole record we have no doubt that whether O'Connell indicated he had framed Wolf or, more specifically, that he wanted to recant, he should have been

returned to the stand for further examination. It was of no particular consequence that defense counsel did not make it entirely clear before the trial judge's charge that he wished to recall O'Connell for further cross-examination because of his statement about framing Wolf. If the motive was not further examination of O'Connell, it is difficult to comprehend what the purpose could have been. Even if it could be said that counsel's aim in obtaining the side-bar conference was to seek advice because of the unusual turn the case had taken, the trial judge should have suggested an application to reopen, or should have reopened the case on his own motion and recalled O'Connell. But in the colloquy which took place after the court's charge had been delivered there can be little question that counsel made known his desire to have the jury brought back and the witness returned to the stand for further examination. If that course had been followed, the position of the jury to evaluate his credibility would have been enhanced considerably. The additional testimony would have provided an improved perspective not only for appraisal of O'Connell's veracity but of the truthfulness of Wolf's confession as well (providing, of course, that Wolf's confession was voluntary). Under the circumstances, in our judgment the judge's refusal to reopen the case and to require O'Connell to submit to further cross-examination constituted a mistaken use of discretion of such prejudicial moment as to require reversal of the conviction.

## II.

As has been indicated above, we have refrained from considering the trial court's action on defendant's motion for new trial after the jury verdict. We have done so because we feel that the jury at the original trial should have been allowed to consider all of O'Connell's testimony including the recantation before reaching its verdict. This does not mean that his recantation testimony at the hearing on the motion for new trial should go unnoticed. Manifestly he swore falsely either at the

trial or on the new trial hearing. We assume the State has set in motion the proper criminal proceedings against him for the determination of that matter.

## III.

At the trial the State was able to introduce in evidence an inculpatory statement obtained from Wolf. It was objected to as being involuntary. Among other things defendant maintained it was the product of physical coercion. He said the police officers had beaten him so severely that he was forced to admit participation in the crime, of which he was in fact innocent.

A preliminary hearing was conducted outside the presence of the jury as to the admissibility of the confession. Considerable testimony was offered on both sides, particularly on the subject of physical abuse of Wolf by the police. At the conclusion of the hearing, the trial judge admitted the confession in evidence. In doing so, however, it is plain that he misconceived the purport of this Court's ruling in *State v. Smith*, 32 *N. J.* 501, 514 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961). He admitted the confession because he found that on the evidence submitted the minds of reasonable men could differ as to whether it was given voluntarily by Wolf. He seemed to feel that a trial judge's initial duty at the preliminary hearing, where a defendant denies voluntariness, is to decide whether the evidence on the subject raises a factual issue; and, if so, the confession should be admitted in evidence, and the issue then submitted to the jury for ultimate determination.

The rule respecting the admissibility of confessions where voluntariness is contested has been restated a number of times since *State v. Smith* and since the present case was tried. We repeat the restatement: At the conclusion of the preliminary inquiry on voluntariness, *i. e.*, after all of the proof of the State and the defendant has been submitted (see *State v. Tassiello*, 39 *N. J.* 282, fn. 292 (1963); *State v.*

*Sullivan*, 43 *N. J.* 209, 224, 226 (1964)), (1) the trial judge must make his own finding as to whether the State has sustained the burden of proving that the confession is a voluntary one, and (2) if he finds it to be voluntary and hence admissible, he will admit it in evidence without disclosing his own finding to the jury. It must be kept in mind that this duty to make an independent determination as to the voluntariness of a confession is of constitutional dimension. *Jackson v. Denno*, 378 *U. S.* 368, 84 *S. Ct.* 1774, 12 *L. Ed. 2d* 908 (1964). Thereafter, at the close of the entire case, he must instruct the jury to consider the same issue and to disregard the confession unless the State has proved that it was made voluntarily. *State v. LaPierre*, 39 *N. J.* 156, 162 *cert.* denied *Bisignano v. New Jersey*, 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963); *State v. Jackson*, 43 *N. J.* 148, 166–167 (1964).

Since the case is to be retried, undoubtedly the issue of voluntariness of Wolf's confession will be treated in accordance with the procedure stated.

## IV.

We have examined the remaining grounds of appeal raised by defendant. On the record before us we find nothing with respect to them which constitutes prejudicial error.

For the reasons stated, the judgment of conviction is reversed and the cause is remanded for a new trial.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.