UNITED STATES of America

v.

William Edward RABB et al.

Appeal of William Edward RABB, Appellant.

No. 71–1368.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1971.

Decided Dec. 13, 1971.

---

John G. Graham, McGlynn, McGlynn, Ruprecht & Graham, Newark, N. J., for appellant.

William Braniff, Asst. U. S. Atty., Newark, N. J., for appellee.

Before ALDISERT, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

This is an appeal by William E. Rabb from a conviction in the District Court for the District of New Jersey for robbing a Federally insured bank, and putting lives in jeopardy during that robbery, in violation of 18 U.S.C. § 2113(a). Only one significant issue is raised in this appeal: Whether the district court was correct in denying the jury's request to have a portion of the transcript read to them.

Rabb was tried together with a co-defendant, one James Phillips. A third defendant, also charged with the same offenses, was severed from the case because his attorney was not ready to proceed. As to Rabb and Phillips, the evidence presented at trial varied. Phillips was connected with the crime by hard physical evidence: a fingerprint, found on the car used in the commission of the robbery. Rabb, however, was convicted solely on the basis of identification evidence—the testimony of three witnesses, Edward Martini, a bank teller, Richard Weber, another bank employee, and Harry G. Stoothoff, Jr., who was driving past the bank at the time of the robbery. Weber and Martini both made their identifications although the person they claimed to be Rabb was wearing a white handkerchief around his face. Stoothoff saw a man he identified as Rabb in the getaway car without a mask.

After the jury had deliberated about two hours, they returned and requested a reading of the testimony of Weber and Stoothoff. The court refused the request, but read its summary of the testimony of the two witnesses, and added that if the jury had a different recollection of the testimony they should use it to guide them. Objections were taken both to variations in the judge's summary from the testimony actually given and to the failure to read the full testimony of these two witnesses.

Some confusion exists in the testimony as to whether or not Rabb's attorney objected specifically to the refusal of the trial judge to grant the request by the jury to have part of the transcript read. There is no doubt, however, that the attorney for Phillips did make such an objection. Our reading of the transcript convinces us that both attorneys were acting in unison at the time, and that the judge in fact understood that the objection made by Phillips' attorney applied to both defendants.

The testimony which the jury desired to have read involved about forty pages. Rabb was convicted and sentenced to twenty years.

Normally, a request by the jury to have a portion of the transcript read back to them lies within the broad discretion of the trial judge. United States v. Chicarelli, 445 F.2d 1111 (3d Cir. 1971). The rationale behind a refusal on the part of trial judges to allow a reading of a portion of the testimony is twofold: first, because these requests may slow the trial; and second,

because a reading of only one portion of the testimony may cause the jury to give that portion undue emphasis.

■ In the instant case, neither of these reasons could have provided a basis for the court's refusal. The eye witness testimony of the three witnesses identifying appellant was the only evidence linking him to the crime. The testimony of all three witnesses tended to interrelate since they all described features and clothing allegedly those of appellant. Thus, the testimony which the jury asked to have read to them was absolutely crucial to their determination of appellant's guilt or innocence.

This was not a case where, from a mass of dimly remembered data, the jury desired to cull and spotlight a small bit of fact. The entirety of the evidence presented against appellant, while presenting problems in terms of evaluation, was short: the testimony of only three witnesses. Reading the transcript of the testimony of two of these witnesses would not necessarily emphasize it or preclude consideration by the jury of the other testimony. In these circumstances, it must be assumed that the jury asked for a reading of this testimony because it was in doubt or in disagreement upon its proper evaluation.

United States v. Jackson, 257 F.2d 41 (3d Cir. 1958), is directly on point. The issue presented in *Jackson* was entrapment. The jury asked the court whether or not an informer involved with the defendant was a Government employee. The court told the jury that it was unable to remember whether or not the informer was a Government employee and directed them to return to the jury room for further deliberations without having read any of the testimony to the jury. Attorney for the defendant requested that the pertinent portion of the testimony be read to the jury. But before any action was taken the jury returned a guilty verdict.

This court noted that "[T]he point of the jury's question was highly relevant."

It held that "in this particular situation we think the defendant was entitled to have the jury informed as a matter of right." id., at 43.

The request by the jury for a reading of the testimony in the case *sub judice* is, in fact, even more compelling than in *Jackson*. In both cases, the evidence on which the jury wanted guidance was crucial to its verdict. In the case *sub judice*, however, the evidence was *identification* evidence. The dangers inherent in such testimony have many times been commented upon. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Courts must scrutinize this type of evidence especially carefully; juries must do the same.

Appellee argues that in *Jackson* the jury asked a question, and not explicitly for a reading of the transcript. This is a distinction of form, not substance. By asking for a reading of the transcript, the jury in the instant case merely showed that they were attentive and remembered the case well enough to know which parts of the testimony would be relevant to an implied question. That question was whether Weber's and Stoothoff's identification of Rabb was convincing beyond a reasonable doubt.

■ It is in this light that the length of the testimony which the jury was asked to have read must be considered. Although we have no evidence before us as to the amount of time required to read approximately forty pages of testimony, the court takes judicial notice that in normal circumstances, the reading would have taken considerably less than an hour. This is not such a delay, which could be held, per se, unreasonable.

The decision we reach is supported by the Standards Relating to Trial by Jury (ABA Project on Minimum Standards

of Criminal Justice), § 5.2 and Commentary at 134–38 (Approved Draft 1968):[1]

> 5.2 Jury request to review evidence. (a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.

■ One final comment is in order. Not only did the trial court refuse to have the testimony read to the jury, but it also gave the jury its own summary of the testimony. This technique raises the possibility that the jury may be given an erroneous view of the testimony, and is therefore much less desirable than having the actual transcript read. The American Bar Association Minimum Standards of Criminal Justice specifically rejected this alternative for the reason we have stated. See Comment to Section 5.2(a), Standards, supra. Since the testimony requested by the jury went to the very heart of the case, could not have lead to an unjust emphasis on this testimony to the exclusion of other relevant testimony, and was not unduly long, we hold that it was error for the district court to deny the jury's request.

The judgment of the district court will be reversed and a new trial ordered.

ALDISERT, Circuit Judge (concurring).

Although I agree with the result reached by the majority, I do not construe its opinion to mean that we are adopting the American Bar Association Standards Relating to Trial by Jury, § 5.2, Jury Request to Review Evidence, as a governing rule of criminal procedure in this Circuit. I am not ready to subscribe to the unrestricted use of this standard. As the majority observes, note 1, *supra*, the standard is intended to restrict the discretion of the trial judge. I view as unwarranted and undesirable this attempt to dilute a trial judge's authority.

Although designed to remedy certain abuses of judicial discretion, the mandatory features of this standard are themselves potentially generative of substantial abuses. I can envision trial counsel, in closing arguments, inviting the jury to request a reading of particular portions of the testimony. As a result, individual jurors could satisfy personal whims and attract undue attention to unimportant, collateral, and tangential aspects of a trial's testimony. Under the A.B.A. standard, the trial court would be virtually helpless to control such abuses.

"In a trial by jury in a federal court, the judge is not a mere moderator, but

1. The comment on Section 5.2(a) discloses that it was intended to have the judge's discretion in this situation construed narrowly:

> "The thrust of the second sentence of section 5.2(a) is that while the court need not grant every request received from the jury, its, discretion to deny jury review of evidence is strictly limited. The justification for this approach is well expressed in State v. Wolf, 44 N.J. 176, 185, 207 A.2d 670, 675 (1965):
>
> > " 'When a jury retires to consider their verdict, their discussion may produce disagreement or doubt or failure of definite recollection as to what a particular witness said in the course of his testimony. If they request enlightenment on the subject through the reading of his testimony, . . . the request should be granted. The true administration of justice calls for such action. When there is a doubt in the minds of jurors as to what a witness said, it cannot be prejudicial to anyone to have that doubt removed by a rehearing of his testimony. There is no need to be chary for fear of giving undue prominence to the testimony of the witness. If . . . a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement.' "

is the governor of the trial for the purpose of assuring its proper conduct * * *." Herron v. Southern Pacific Co., 283 U.S. 91, 95, 51 S.Ct. 383, 384, 75 L. Ed.2d 857 (1931). Although acceding to the jury's request is required "[w]henever the jury's request is reasonable," the reality is that this affords the trial judge very little veto power over the requests. The court can determine the reasonableness of the request only by asking the jurors what prompted their action. Such an inquiry, however, would be an improper intrusion by the court into the deliberation process of the fact finders. Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245, 1247 (3d Cir. 1971). Thus, the reality is that, except in obviously flagrant situations, the trial judge, to avoid trial error, would normally accede to the jury's request, without question, and hence, without any real discretionary power in the matter.

Nevertheless, I would reverse and order a new trial because I find the possibility of prejudicial error to have been present under the peculiar circumstances which developed at trial. The critical issue in Rabb's case was identification. The court has addressed itself to the problems of eye-witness testimony, and recently has imposed additional safeguards where the guilt or innocense of a defendant turns on identification. United States v. Barber, 442 F.2d 517, 525 (3d Cir. 1971). There, we referred to Justice Brennan's comment in United States v. Wade, 388 U.S. 218, 228, 87 S. Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967): "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."

The jury request for a rereading of the testimony of two eye-witnesses could hardly be construed as frivolous. The court had two options: to give a fair synopsis of the critical testimony, or to have the testimony read verbatim. It did neither. The summary of the testimony was couched in conclusory expressions and contained no references to (a) inconsistencies in Weber's critical testimony, relating to the description of Rabb's clothing, and (b) certain variances between Weber's and Stoothoff's description of Rabb's face covering. Moreover, when the court's attention was directed to the inadequacy of the synopsis, its attempt at repair was deficient. Because the jury was not given a fair and adequate response to an inquiry addressed to the critical issue of eye-witness identification, the very real possibility of prejudicial error tainted these proceedings.[1]

1. The cross-examination of Weber by Rabb's attorney:

Q. What was he wearing?
A. I know he had a hat on.
Q. What color?
A. At this point I cannot remember that.
Q. His eyes were brown, weren't they?
A. Yes.
Q. All right. What else did he have on?
A. He had on a jacket or turtleneck sweater that was pulled up to over his mouth.
Q. He had what color turtleneck sweater?
A. I didn't say color.
Q. Well, would you tell us the color?
A. I would. I think it was gray at this point. Again, I don't remember that far back.
Q. And pulled up over his face?
A. Yes.
Q. And what color jacket did he have on, if he had a jacket on?
A. I could not answer that now.
Q. You didn't see a jacket?
A. I am not sure if he had a jacket or what color it was at this point.
Q. Fine. Did he have gloves on?
A. Yes, he did.
Q. Pants?
A. Yes, he had pants on.
Q. What color?
A. Again, I don't remember the color.
Q. Shoes?
A. I couldn't tell you what the shoes were.
Q. Couldn't tell us?
A. No.

 * * * * *

Q. What type of material was the mask you do recall on Rabb? Was it a handkerchief or was it his shirt?

A. I believe it was his shirt—no, wait, excuse me. One of them had what looked like a T-shirt, a white T-shirt that had been—was around his face.

Q. Which one?

A. That was Mr. Rabb, the gentleman in the blue coat.

The cross-examination of Stoothoff:

Q. When they came out of the bank, the second man [Rabb] came out of the bank, did he have anything over his face?

A. Yes, he did.

Q. What did he have?

A. He had a slight bandana up around here (indicating).

Q. A bandana?

A. I would say a bandana.

Q. What color was it?

A. Light color.

Q. Light color?

A. Yes.

Q. Wearing a hat?

A. Yes.

Q. Jacket?

A. No.

Q. No jacket. He had a bandana on and a hat. Shirt?

A. Of course he had a shirt on.

Q. Sweater?

A. I didn't see no sweater, no.

Summarizing the testimony of witness Weber in response to the jury's request that it be read, the trial court said:

On cross-examination he stated that he was sure that Rabb was the man and could identify him by his eyes and a part of his nose.

He further stated that he was in a position to see him and that he gave a description of the clothes that he was wearing on the day of the occasion. You will recall that both he and Martini stated that Rabb had gloves on at the time of the commission of the robbery.

On cross-examination he stated that he was about eight feet from Rabb and twelve feet from Phillips during the robbery. He stated that Rabb had something which looked like a white T-shirt pulled up over his face and that Phillips, if Phillips had a mask on, it was only partially over his mouth.

The testimony of Stoothoff was summarized as follows:

. . . And two Negroes ran from the bank to the car and got in.

\* \* \* \* \*

. . . He identified Phillips and Rabb as two of the occupants of the car.

Mr. McGlynn, counsel for Rabb, said:

. . . And in addition to that, your Honor has also now told them what Mr. Martini said when you weren't requested to do so, and that you have failed to tell them that Mr. Stoothoff and Mr. Weber described the clothing on Rabb at variance.

THE COURT: Members of the Jury, may I state to you that there was some variance in Weber's testimony with, I believe it was Mr. Martini's testimony with respect to the type clothing that Mr. Rabb was wearing at the time of the alleged robbery.

\* \* \* \* \*

MR. McGLYNN: May I also say, sir, that according to the notes that I have, which may be incorrect, but according to my notes, Mr. Weber first testified that Mr. Rabb wore a gray turtleneck sweater. Then he testified he wore a T-shirt.

THE COURT: I told them there was a variance.

MR. McGLYNN: Then he wore a bandana.

MR. FLYNN: You see, your Honor, there is a danger in reading notes to a Jury rather than repeating the testimony which probably will take only about a half-an-hour for the Court Reporter.

THE COURT: We just don't do that.

MR. McGLYNN: Thank you, your Honor.

MR. KOELZER: Thank you.

THE COURT: (addressing the Jurors)

With respect to the clothes that Mr. Rabb was wearing, Mr. Weber said that he had a hat and jacket and turtleneck sweater. He doesn't remember the color of the sweater, cannot remember the color of the jacket, but that he had gloves on, and could not see the color of his shoes when he asked that.