126 N.J. Super. 442 (1973)
315 A.2d 415
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH GARRIGAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1973.
Decided April 16, 1973.
Rehearing granted May 14, 1973.
Reargued May 22, 1973.
Decided July 6, 1973.
*443 Before Judges KOLOVSKY, MATTHEWS and CRAHAY.
Mr. John J. Connell argued the cause for appellant (Mr. Henry F. Gill, attorney).
Mr. John De Cicco, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General, attorney).
*444 PER CURIAM.
Defendant was indicted together with one George Kramer by a Mercer County Grand Jury in a three-count indictment charging (1) conspiracy to commit misconduct in office (N.J.S.A. 2A:98-1 and 2); (2) misconduct in office (N.J.S.A. 2A:85-1 and 14); and (3) extortion (N.J.S.A. 2A:105-1 and N.J.S.A. 2A:85-14). The trial commenced on April 20, 1972 and concluded on April 27, 1972. On April 25, 1972, the prosecutor moved to dismiss the charges against Kramer, and for an order compelling Kramer's testimony under our immunity statute. Both motions were granted. A subsequent motion for a mistrial based on these rulings was denied.
The trial thereafter proceeded against defendant alone, with Kramer testifying on behalf of the State. The jury, after deliberation, found defendant guilty of the first and second charges and acquitted him of the third charge  extortion. Defendant was thereafter sentenced to two concurrent one to three year sentences in State Prison, Trenton, with all but 12 months of the sentences suspended, the court directing that defendant serve a custodial term of 12 months in the Mercer County Work House.
Defendant first argues on appeal that the verdicts were against the weight of the evidence. However, as he subsequently recognized and acknowledged in his reply brief, his argument was based on the erroneous assumption that State v. Donohue, 2 N.J. 381 (1949) still controlled our law applicable to circumstantial evidence. See State v. Mayberry, et al., 52 N.J. 413 (1968), cert. den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969).
Defendant next argues that the severance of his codefendant in mid-trial and the subsequent grant of immunity was so prejudicial that a mistrial should have been declared by the trial judge. It is defendant's theory that the prosecutor knew all along that certain statements given by Kramer would be inadmissible at the trial. We find that the record fails to support the theory of defendant which presupposes that plaintiff unfairly used Kramer in an attempt *445 to influence the jury. There is no other showing of prejudice. In addition, we note that the trial judge emphasized during his charge that there was no significance to be drawn by the jurors from the dismissal of the charges against Kramer and, further, that the granting of immunity did not lend weight to Kramer's credibility. Compare State v. Provoid, 110 N.J. Super. 547 (App. Div. 1970).
Defendant also contends that he was prejudiced by the failure of the trial judge to have the reading of certain testimony completed before the jurors resumed deliberations. After deliberating for several hours the jury raised two questions:
(1) Did this indictment come from the complaint made by Saperstein?
(2) Did Kramer and Saperstein both agree to the meeting in September?
The trial judge properly termed the answer to the first question immaterial. In answering the second question, the judge properly told the jurors that it would be improper for him to give them his recollection. The foreman then stated:
Your Honor, I feel it is advisable if we can hear the testimony again of the two witnesses.
At this point, the testimony of Saperstein was reread. The physical act of reading was performed by the court reporter who sat in the witness box and read from his notes. No other court reporter was present at the time to take down what he read. During the reading, the jurors' dinner arrived, and at the conclusion of the reading of Saperstein's testimony the jurors were informed by the trial judge that dinner was waiting for them. At that point, the foreman and possibly several of the jurors indicatel to the court that they had heard all that they had wanted to hear. Unfortunately, this colloquy between the foreman and the trial judge took place *446 while the court reporter was sitting in the witness box, with the result that it was not taken down as part of the record. No objecion was thereafter made by either side.
At the original argument in this case we were led to believe that the jurors were permitted to retire for dinner after the conclusion of the reading of the Saperstein testimony but with the expectation by the parties that the reading of Kramer's testimony would be conducted after dinner. For some reason unexplained on the record, we believed the failure to read Kramer's testimony was overlooked. We noted in our original opinion that "The record does not disclose that any objection was made either before or after the verdict by defendant; nor was the failure to read Kramer's testimony raised as a ground on the motion for a new trial."
After our original opinion and the dissenting opinion of our brother Crahay were filed, we received a letter from Judge Schoch who tried the case below, advising us of the facts surrounding the reading of the testimony, as we have outlined them above. Counsel were provided with copies of Judge Schoch's letter and given the opportunity to present their views thereon in writing. We thereafter permitted reargument of this issue. We have concluded that the facts as set forth in Judge Schoch's letter, and as incorporated in this opinion, accurately set forth what actually occurred during the rereading of the testimony, even accepting as true the statement by defendant's trial counsel with respect to what defendant now urges is a critical aspect of the case, that his counsel's "present recollection * * * is not sufficiently adequate to permit [him] to either affirm or disavow the narrative thereof set forth by Judge Schoch therein."
The rules governing the reading of testimony at the jury's request are set forth in State v. Wolf, 44 N.J. 176, 185-186 (1965). See also, State v. Wilkerson, 60 N.J. 452, 460 (1972). The rule simply stated provides that the grant of such a request is in the discretion of the trial judge, but that the judge should readily accede when the jurors request to hear testimony read, absent some unusual circumstances. *447 Here, Judge Schoch did accede to the jurors' request. The reading was not completed because the jurors requested that it be terminated, even though all of the testimony originally requested to be read had not been read. We find nothing in Wolf or Wilkerson, above, which requires a trial judge to continue the reading of testimony commenced at the jurors' request after the jurors asked that the reading be terminated, particularly where, as here, defendant offered no objection and did not ask that the reading be continued and thus acquiesced in the jurors' request that it be terminated. Defendant may not fairly now seek to recall his acquiescence in the jurors' request. The failure to read Kramer's testimony to the jurors affords no basis or justification for reversal.
Apposite is what the court said in State v. Macon, 57 N.J. 325, 333-334 (1971):
* * * It is fundamental in our practice that a claim of error which could have been but was not raised at trial will not be dealt with as would be a timely challenge. The reasons are several. It may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment. Further, to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal. * * * In any event, except in extraordinary circumstances, a claim of error will not be entertained unless it is perfectly clear that there actually was error. In other words, if upon a timely objection a different or further record might have been made at the trial level, and the claim of error might thereby have been dissipated, we will neither reverse on an assumption that there was error nor remand the matter to explore that possibility. * * * These principles rest upon the belief that our practice offers every opportunity for a fair trial, and that unless there is some order in the trial of cases, the State judiciary cannot hope to meet the swollen demands upon it.
Defendant's last two arguments, that the prosecuting witness should have been forced to produce his income tax returns from 1966 to 1971 "to show what triggered this whole thing was an investigation by Internal Revenue Service," and that the use of a tape recording during defendant's cross-examination of a conversation of an interview between *448 defendant and the prosecutor, taped without his knowledge, we find to be without merit. With respect to the first of these arguments, we agree with the State that the Internal Revenue investigation in no manner figured in the prosecution, and that the basis asserted was not stated at trial. As to the second, the use of the tape was proper during cross-examination. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The wire tapping statute is inapplicable. State v. Vizzini, 115 N.J. Super. 97 (App. Div. 1971).
The judgments of conviction are affirmed.
CRAHAY, J.A.D., dissenting.
I would reverse on the ground that the trial court's failure, in this case, to read all rather than a portion of testimony specifically requested by the jury amounted to a seriously prejudicial abuse of discretion. State v. Wolf, 44 N.J. 176 (1965).
The case was close, and I cannot say beyond a reasonable doubt that the error, be it plain or otherwise, did not have a tendency to mislead the jury to a result it otherwise might not have reached. The failure to satisfy the jury's specific request to read critical testimony generated not only a real but a strong possibility of injustice. State v. Macon, 57 N.J. 325 (1971).
Defendant and one George Kramer were indicted for conspiracy to commit misconduct in office contrary to N.J.S.A. 2A:98-1 and 2. Additionally, the defendant was charged with misconduct in office contrary to N.J.S.A. 2A:85-1 and extortion contrary to N.J.S.A. 2A:105-1. Kramer was charged with aiding and abetting defendant in the latter two offenses contrary to N.J.S.A. 2A:85-14.
After the trial had proceeded into its fourth day the prosecution elected to dismiss the charges against Kramer and procured an order compelling him to testify against Garrigan under the New Jersey Immunity Statute (N.J. *449 S.A. 2A:81-17.3). As the trial court noted, the essential witnesses against defendant were Kramer and Jacob Saperstein. Except for Kramer's testimony, the case was essentially "one on one" as between Saperstein and defendant. Saperstein asserted that some six years earlier he gave $1500 to Kramer to give to Garrigan in return for a governmental favor;  expeditious payment of Urban Renewal relocation expenses. Garrigan categorically denied the payment and other wrongdoings.
Saperstein testified that on September 16, 1966 he gave Kramer the $1500 involved. He had procured the $1500 by drawing a check to cash against an account in the name of his business and then endorsed it "Jacob Saperstein" indicating in the checkbook that it was for "cash for back pay  Jack and Sam Saperstein  $1500  September 16, 1966." Kramer denied receiving any money from Saperstein or giving any to Garrigan. Defendant's guilt or innocence then turned solely on who was to be believed,  Saperstein, Garrigan or Kramer, to the extent that the latter denied receiving money from Saperstein or giving it to Garrigan. As noted earlier, in my view, the case was "close". The trial court indeed in ruling on post-trial defense motions stated, after finding that there was enough evidence for jury consideration,  "This whole case is built on a limited amount of evidence ..."
Testimony during the trial was taken over five days and the jurors were given the court's instructions and began deliberations at 10:20 A.M. on the sixth day. At about 3:30 in the afternoon the court received two notes from the jury. The first stated that they could not come to a unanimous decision on the first two counts of the indictment. Ten minutes later a note asking the court to "give an explanation of the first two counts of the indictment". Assuming the second note to have superseded the first, the court recharged at considerable length on the elements of conspiracy and misconduct in office. At 6:05 P.M. the jury again returned to the courtroom. The court first advised them that their dinner had been *450 ordered. Then in response to a question in the jury's note, "Did this indictment come from the complaint made by Saperstein?", the court, as the majority notes, properly ruled the question immaterial. (Saperstein had, in fact, first related his version of the alleged transactions to the Prosecutor's office on August 3, 1971, almost five years later.)
A second question was addressed to the court 
Did Kramer and Saperstein both agree to the meeting in September? (Emphasis added)
The court answered that it would be improper for him to give his recollection of the testimony. He told the jury that if they wanted a portion of the testimony read back 
... we will have it read back ... So if you want Mr. Kramer's testimony read back for instance, we'll have it read back. If you want Mr. Saperstein's read back, we'll have that read back. If you think that's necessary ... (emphasis added)
The foreman then responded, 
Your Honor, I feel it advisable if we hear the testimony again of the two witnesses. (emphasis added)
The court after asking if anyone did not agree with a reading, ordered it.
Saperstein's testimony was read, according to the record, until 7:03 P.M. at which point the court stated, "We have ordered dinner but it won't get here for another ten minutes. All right, you may retire." The jury thereupon left the courtroom "to resume its deliberations." Prosecution and defense counsel neither made objection nor observation on the failure to read Kramer's testimony.
At 8:45 P.M. the jury announced its verdict finding defendant guilty of conspiracy and misconduct and not guilty of extortion.
*451 Saperstein's testimony covered 57 pages of the trial transcript, reciting dealings with defendant and others and detailing meetings with Kramer including the one at which he allegedly turned over the $1500 cash to be given to the defendant.
Kramer's testimony covered but five pages of the transcript. In substance he testified that he knew the defendant twelve or thirteen years and Saperstein approximately fifty years, that Garrigan called him and asked him to stop and see Saperstein and have Saperstein "call him up", that he conveyed the message and sometime later passed Saperstein on the street in his truck calling from the truck, asking whether or not he had called Garrigan. He specifically denied receiving any money from Saperstein or giving any to Garrigan.
Inexplicably, the jury did not have this critical testimony read back to them. We could not elicit any reason at oral argument, nor does the record enlighten on the failure except insofar as we are told that the jury's dinner was on the way.
State v. Wolf, supra, pronounces at p. 185 
It should be remembered that the reading of all or part of the testimony of one or more of the witnesses at a trial, criminal or civil, at the specific request of the jury during their deliberations is discretionary with the trial court ... When a jury retires to consider their verdict, their discussion may produce disagreement or failure or doubt of definite recollection as to what a particular witness said in the course of his testimony. If they request enlightenment on the subject through a reading of his testimony, in the absence of some unusual circumstance, the request should be granted. The true administration of justice calls for such action. Where there is a doubt in the minds of jurors as to what a witness said, it cannot be prejudicial to anyone to have that doubt removed by a rehearing of his testimony. There is no need to be chary for fear of giving undue prominence to the testimony of the witness. If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. It must be assumed also that if they had any similar *452 doubts or disagreements about statements of other witnesses they would seek the same remedy ... But generally where the testimony is reasonably available, a judge should not refuse to grant a jury request to have it read merely because the reading would take time. In these days when the purpose of our procedure is full, fair and free exposure to all relevant evidence in a case both before and during the trial, there is no just reason for insisting that laymen jurors must have an unfailing and unanimous memory of all the testimony they hear in the courtroom... (emphasis added)
Here, then, the trial court recognized the direction in which his discretion was to be employed under State v. Wolf, supra, but having undertaken to satisfy the jury's specific inquiry neglected to complete it. I equate "neglect" with "refusal" in relating the omission here with that in Wolf.
The principle has been restated in State v. Wilkerson, 60 N.J. 452 at p. 460, (1972) where the court said:
Normally a trial court, which has ultimate discretion in the matter, should readily accede to any request by a jury to have any particular testimony read to it during deliberations. (emphasis added)
State v. Kuske, 109 N.J. Super. 275 (App. Div. 1970) and State v. Cox, 101 N.J. Super. 470, 480 (App. Div. 1968), certif den. 53 N.J. 510 (1969) are readily distinguishable.
In State v. Kuske, supra, the trial court failed to furnish all of the information requested by the jury. The Appellate Division felt in that case it was not prejudicial although it questioned the failure of the judge to honor the jury's request in full. The court there noted that the guilt of the defendant was convincingly established by the evidence.
In State v. Cox, supra, we found no abuse of the trial court's discretion nor any prejudice in failing to read all of a State's witness's testimony, since the jury indicated that it had heard enough.
In United States v. Rabb, 453 F.2d 1012 (3d Cir.1971) the defendant was convicted of bank robbery. The jury after two hours deliberation requested the reading of the testimony of two witnesses. The Court refused and instead read its summary *453 of the testimony. Defense counsel objected to the procedure. Approximately forty pages of transcript were involved. Recognizing that such requests were within the discretion of the trial judge, the Court stated the rationale behind the refusal on the part of trial judges to allow a reading of a portion of the testimony. It was held to be twofold, 1) that the request might tend to slow the trial and 2) that the reading of only one portion might cause the jury to give the portion read undue emphasis. It was held in Rabb that the rationale was not operative. At p. 1014 
... It must be assumed that the jury asked for a reading of this testimony because it was in doubt or in disagreement upon its proper evaluation [and further] ... the evidence on which the jury wanted guidance was crucial to its verdict ...
The Court there found that the testimony went "... to the very heart of the case," and that the testimony was "... not unduly long ..." In reversing for an abuse of discretion the Court noted that its decision was supported by the Standards Relating to the Trial by Jury (ABA Project on Minimal Standards of Criminal Justice) Sec. 5.2 and Commentary at 134-38 (Approved Draft 1968):
5.2 Jury request to review evidence (a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.
In a concurring opinion in Rabb, Judge Aldisert stated that he was not ready to subscribe to the unrestricted use of the ABA standard. I am of the same view and would have each case be its own barometer to measure whether a trial court's discretion was properly employed.
In U.S. v. Jackson, 257 F.2d 41 (3d Cir.1958) a narcotics conviction was reversed. The jury had asked a specific *454 question and while the court and counsel were mulling whether or not to read portions of the transcript to it and by the time the court had decided that it would cause a portion of the transcript to be read to them, the jury announced its verdict of guilt. In answer to a question from the Judge, the foreman before announcing the verdict declared that they no longer needed an answer to their earlier question.
At p. 43 
... we think that the failure to permit the reading of the relevant testimony at a time when it would have been useful in the jury's deliberations created unfairness to the defendant.
See also Annot., 50 A.L.R. 2d 176 (1956).
In this case, if the trial court had denied the jury's request for the reading of Saperstein's and Kramer's testimony, Wolf would have been fully operative. In my view, it was far more damaging here to have read only Saperstein's when Kramer's testimony probably would have generated consideration by them not only as to substantive matters, i.e. the meetings between Kramer and Saperstein, but might very readily have produced credibility considerations which could have undermined Saperstein's version of the involved matters. Kramer's testimony was not cumulative. A reading would have taken but minutes. The jury specifically requested it.
The majority finds it highly significant that defense counsel did not object to the procedure during the reading. (Neither did the prosecutor even though Kramer was his witness, albeit not helpful). I feel, that once communication is undertaken between a jury and a court, the trial judge becomes the captain of the ship and is obligated to follow through in meeting the juror's needs during the critical moments (or hours) of deliberation. Our inability to assess fault for the failure to honor the jury's request does not soften the impact of Wolf, supra.
*455 If either counsel had addressed the court, the omission to read Kramer's testimony might have been averted. I am not aware of any authority which requires defense counsel's objection called for by the majority. If there be such a requirement, I would then nonetheless find plain error. State v. Macon, supra.
The majority also notes that the jurors did not notify the trial judge that they desired the reading to continue. True enough. But they did specifically request it. See U.S. v. Jackson, supra. One might opine that "dinner" blinded all to the omission. In a similar vein the State in its brief, referring to the "court reporter's omission", urges that the jury was apparently satisfied with hearing only Saperstein's testimony. If this indeed was the fact, then in view of the jury's request and the conflicting testimony the harm to defendant was escalated.
Here, where the proof of guilt was not clear or strong, I would find that the trial court's omission constituted an error of magnitude with a heavy potential to affect the jury verdict, State v. LaPorte, 62 N.J. 312 (1973), and reverse.

ON PETITION FOR REHEARING
In response to the majority per curiam opinion affirming defendant's conviction, I filed the above dissent.
Thereafter on April 23, 1973, pursuant to R. 2:11-6, the prosecutor by verified petition sought a rehearing and summary redetermination of the appeal with the aim, I suppose, of causing the dissenting opinion to be withdrawn.
In support of the petition we have been supplied with affidavits by the prosecutor who tried the case and the Acting Chief of County Detectives who was in charge of its investigation. Contemporaneously, the trial judge advised us by letter of his recollection of what occurred during the testimonial re-reading.
The prosecutor's recollection was that the court reporter took the witness stand to re-read the testimony and that *456 prior to completing Saperstein's testimony the jury foreman indicated that the reporter had read enough and that it would not be necessary to read further. At this point, according to the prosecutor's recollection, the trial court asked the other jurors if they were satisfied and that they all nodded in the affirmative.
The Chief of County Detective's recollection was substantially similar to the prosecutor's and that 
It is my recollection that at no time was the testimony stopped because of the arrival of dinner but rather the Foreman of the Jury indicated to the court that sufficient testimony of Saperstein had been read ... and the Court asked the other jurors if that was satisfactory and they answered in the affirmative.
(The transcript of the trial indicates that the reporter, "read the testimony of Mr. Saperstein," without interruption, and that the "dinner announcement" followed it.)
At the oral argument on the hearing, we solicited from the prosecutor at what point he recalled Saperstein's testimony being ended. His recollection then was that it was after the discussion of Saperstein's second meeting with Kramer i.e. at the time he picked up the check for $1,500. The trial record reflects that this occurred at a very early point in Saperstein's testimony. It does not square with the trial transcript which, as noted in the dissenting opinion, reflects that the jury returned for additional instructions at 6:05 P.M. and that the reading of the Saperstein testimony concluded at 7:03 P.M.
Defendant's trial counsel, by affidavit, in response to the petition, disclaims present recollection of the events sufficient for him to affirm or disavow what occurred.
As noted, the trial judge submitted a letter dated April 24, 1973 outlining his recollection of the proceedings. Contrary to the State's position, his recollection is that at the conclusion of Saperstein's testimony the jurors were informed that dinner was awaiting them and that at that point, at least the foreman and possibly several of the jurors *457 indicated that they had heard what they wanted to hear. The trial judge advises us that the colloquy took place while the court reporter was in the witness box and therefore no record was made of the goings on. In view of the indication by the jury that they had heard enough the trial judge advises us that he did not cause Kramer's testimony to be re-read.
I join with my brothers in the majority opinion insofar as they accept the trial court's recollection of the events as the most probable  the record tends to support it  but I am still not persuaded that defendant had a full and fair trial. If some of the jurors were satisfied with hearing again Saperstein, without Kramer's flat contradictions, then the questions addressed to the trial court by the foreman on the nature and extent of the meetings between Kramer and Saperstein were but partially  and perilously for Garrigan  answered. I am not satisfied that State v. Cox, 107 N.J. Super. 470 (App. Div. 1968), certif. den. 53 N.J. 510 (1969) is operative on this record. In Cox this Division specifically found that it could not perceive how the defendant there was prejudiced by the omission to read the entire testimony sought by the jury. I accept Cox but now reiterate, the thoughts in my dissent that in a case as close as this, I, plainly and simply, cannot find beyond a reasonable doubt that there was no prejudice of reversible magnitude. See again, U.S. v. Rabb, 453 F.2d 1012 (3d Cir.1971); U.S. v. Jackson, 257 F.2d 41 (3d Cir.1958).
I am not persuaded, even if the record stands supplemented, that it warrants a withdrawal of my dissent and accordingly I maintain it and vote to reverse the conviction.