762 A.2d 660 (1999)
335 N.J. Super. 359
STATE of New Jersey, Plaintiff-Respondent,
v.
Tyrone WILSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 9, 1999.
Decided May 17, 1999.
*661 Ivelisse Torres, Public Defender, for appellant (Daniel V. Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).
Peter Verniero, Attorney General, for respondent (Kathleen M. Gusler, Deputy Attorney General, of counsel and on the brief).
Before Judges KEEFE and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
A jury found defendant, Tyrone Wilson, guilty, under Indictment No. 94-10-613-I, of purposeful or knowing murder, N.J.S.A. 2C:11-3a(1) or (2) (count one); second-degree possession of a handgun, for an unlawful purpose, N.J.S.A. 2C:39-4a (count two); third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b (count three); and third-degree hindering apprehension, N.J.S.A. 2C:29-3b(1) (count four). In a continued proceeding, under a separate but related indictment, Indictment No. 95-10-598-I, the trial court, based on the evidence submitted to the jury and additional evidence relating to defendant's criminal record, found defendant guilty of second-degree possession of a handgun by a convicted person. N.J.S.A. 2C:39-7b.
*662 The trial court imposed the following sentences under the first indictment: on count one, life in prison, thirty years to be served without parole; on count three, five years in prison, two and one-half years to be served without parole, concurrent to count one; on count four, five years in prison, two and one-half years to be served without parole, consecutive to count one. The court merged count two into count one. Under the one-count second indictment, the trial court sentenced defendant to imprisonment for ten years, five years to be served without parole, consecutive to the sentences imposed under the first indictment. Thus, defendant's aggregate sentence was life plus fifteen years, thirty-seven and one-half years to be served without parole.
Defendant conceded from the beginning of the trial that he had killed the victim, Roman Bernard, by shooting him three times at close range with a handgun. The defenses raised were insanity, diminished capacity, and imperfect self-defense. The jury was permitted to consider those defenses, even though defendant's expert witness conceded that defendant knew that he was shooting the victim and knew that shooting people was wrong. The jury was also permitted to consider the lesser included offenses of aggravated manslaughter and reckless manslaughter.
On appeal, defendant offers the following contentions:

POINT I
THE JURY CHARGE WAS DEFICIENT BECAUSE IT FAILED TO ADDRESS IMPERFECT SELF-DEFENSE, AND FAILED TO INFORM THE JURY HOW TO EVALUATE THE TWO STATEMENTS ALLEGEDLY MADE BY DEFENDANT. (Partially Raised Below).
A. The Court Improperly Denied the Requested Charge on Imperfect Self-Defense, Because Imperfect Self-Defense Was the Crux of the Defense Case.
B. The Court Failed to Properly Charge the Jury Regarding Wilson's Alleged Statements to Thomas Wilson and Quinones.

POINT II
THE COURT IMPROPERLY OMITTED THE CROSS-EXAMINATIONS FROM THE PLAYBACK OF TESTIMONY REQUESTED BY THE JURY, BECAUSE THE CROSS-EXAMINATION OF MRS. BROWN IN PARTICULAR LARGELY UNDERMINED WHAT SHE HAD SAID ON DIRECT.

POINT III
THE COURT'S FAILURE TO INQUIRE WHETHER ANY OF THE JURORS WERE AFFECTED BY AN EMOTIONAL COURTROOM OUTBURST BY THE MOTHER OF THE VICTIM DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT IV
BECAUSE THE DEFENDANT SURRENDERED HIMSELF TO THE AUTHORITIES, THE COURT ERRED IN IMPOSING A CONSECUTIVE SENTENCE FOR HINDERING APPREHENSION. ADDITIONALLY, THE AGGREGATE SENTENCE SHOULD HAVE BEEN THIRTY YEARS WITHOUT PAROLE, BECAUSE DEFENDANT HAD SUBSTANTIAL MENTAL HEALTH PROBLEMS.

I.
On July 22, 1994, defendant attended a party, given by Leslie Ann Brown, at an apartment complex in Wildwood. Among those present in Brown's apartment were *663 his former girlfriend, Nikia Williams, and another of her former boyfriends, the victim, Romand Bernard. During the party, which began around 10 p.m., defendant briefly waived a silver handgun that he had brought with him. There was evidence that he was carrying the gun because he was contemplating suicide. Using a microphone supplied by the party's disc jockey, defendant said to Bernard, "I hope you don't think you're going home with her." He was referring to Williams. Defendant was laughing and everyone else was laughing because defendant seemed to be "playing." He spoke on the microphone for about fifteen minutes, also saying, "Nikia's got a man and he's going home with her tonight. He's going to take care of Nikia's baby." Although Williams thought at first that defendant was funny, after he repeated his remarks several times, she became angry and told him to stop. He complied, apologizing over the microphone to both Williams and Bernard. Williams left the party a little after midnight, as did Bernard a few minutes later. Defendant also left around the same time.
Carolyn Brown, Leslie's mother, watched, from the porch of a friend's apartment in another building in the complex, as people left the party. On direct-examination, she said that she saw the defendant run up to within arm's length of Bernard, who was leaning against a wall of Building E, and she saw five flashes and heard "bangs." She saw Bernard kneel down, then rise and run away. The defendant walked past her almost within "touching" distance; she thought she heard him say, "That's what he gets." As defendant walked away, he met his cousin, Abduhl Spaulding, and handed him the gun. They parted without speaking.
In light of defendant's Point II, we note that on cross-examination, Carolyn Brown said that her attention was drawn to the area of the shooting by the sound of shots, although she continued to claim that she saw defendant run up to the victim. She added that the defendant "like shoved him against the building and that's when I heard the gun shots." She did not "recall" telling defense counsel's investigator that she "thought the two persons were ... struggling." But she did not deny making that statement. Nor did she deny telling the investigator that she did not hear the defendant say anything. In fact, although she could not recall saying that, she said it was possible that she had made that admission. Later in the trial, the investigator testified that she had indeed made the admissions in question.
Bernard's death was caused by three bullets that entered his chest and damaged his liver and aorta. Before he died, he told the police that the defendant had shot him. The defendant admitted the shooting to his uncle, Thomas Wilson, to an ex-girlfriend, and to his cousin Angelo Quinones, an inmate in the county jail, whom defendant met there following his arrest. He did not indicate to any of them that he had shot in self-defense.
Dr. David Bogacki, an expert in clinical and forensic psychology, testified for the defense. He described the defendant as having a borderline range IQ that was lower than 97% of the population. He said the defendant was suffering from mixed substance abuse, was clinically depressed with suicidal ideation, and had a paranoid personality disorder. He also said there was no evidence of any "underlying brain disease or brain disorder." He relied on defendant's statement to him, never otherwise placed before the jury as substantive evidence, that "he thought he, Roman, was going to kill me and that he saw Roman reaching into his pocket and his perception was that Roman was reaching into his pocket to pull out a gun and to shoot him." He concluded his direct-examination by answering "Yes" to this question: "[i]s it your opinion then that on the night in question when my client shot Roman Bernard he truly felt that his life was in danger?"
On cross-examination, Dr. Bogacki agreed that in his report he had indicated *664 that the combination of diagnoses, together with a degree of intoxication as related to him by defendant (but not supported by other witnesses), negated defendant's ability to knowingly or purposely kill the victim. But he further explained that opinion by stating that, as also indicated in his report, the defendant knew that he was shooting the victim and he knew that shooting people in general was wrong, but his understanding was that he was shooting him because he thought the man was shooting him. "You know, it was like more or less, you know, justifiable because he believed the man was pulling a gun and shooting him."

II.
The arguments contained in defendant's first, third, and fourth points are without merit. R. 2:11-3(e)(2). Nonetheless, we will comment briefly.
The trial court did not err in failing to charge separately that imperfect self-defense could reduce murder to manslaughter. No such charge is required. State v. Coyle, 119 N.J. 194, 228, 574 A.2d 951 (1990) (citing State v. Bowens, 108 N.J. 622, 626, 637, 532 A.2d 215 (1987)). Moreover, despite Dr. Bogacki's testimony relating defendant's story, there was no substantive evidence in this case to support the thesis that defendant had acted in self-defense, imperfect or otherwise. State v. Lucas, 30 N.J. 37, 79, 152 A.2d 50 (1959) (explaining that when statements made by the accused to a psychiatrist relate to guilt or innocence, the trial court must give a limiting instruction that the statements "should not be considered by the jury as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate conclusion of the psychiatrist on the question of insanity.").
Defendant also complains of the absence from the court's charge of any reference to the principles of State v. Hampton, 61 N.J. 250, 270-71, 294 A.2d 23 (1972), and State v. Kociolek, 23 N.J. 400, 421, 129 A.2d 417 (1957), with respect to statements made by the defendant to two non-police witnesses, Thomas Wilson and Angelo Quinones.
Hampton does not apply precisely because the statements were volunteered to non-police witnesses. State v. Baldwin, 296 N.J.Super. 391, 398-99, 686 A.2d 1260 (App.Div.), certif. denied, 149 N.J. 143, 693 A.2d 112 (1997).
In Kociolek, supra, the Court held that the trial court erred in refusing to charge the jury that it "should receive, weigh and consider such [oral admissions] with caution in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." 23 N.J. at 421, 129 A.2d 417 (internal quotations omitted). The Court noted that "[t]here are inherent weaknesses in this character of testimony: faulty memory, the danger of error in understanding and repetition." Ibid.
In State v. Jordan, 147 N.J. 409, 428, 688 A.2d 97 (1997), the Court said that "the Kociolek charge should be given whether requested or not." However, the Court also emphasized that the failure to give the charge is not necessarily reversible error:
There may be a rare case where failure to give a Kociolek charge alone is sufficient to constitute reversible error, or there may be a case where the omission of a Kociolek charge in combination with other errors ... may be reversible as plain error. Ultimately, whether the failure to give a Kociolek charge is capable of producing an unjust result will depend on the facts of each case.

[Ibid.] Defendant argues that this is the rare case requiring reversal because Quinones's statement was "critical" to the State's case "that the shooting was knowing and purposeful." But defendant's own expert admitted that the shooting was knowing and purposeful. It is true that *665 neither Quinones nor Wilson indicated that defendant had told them that he believed the victim was reaching for a weapon. But there is also no evidence that the defendant made any such statement to either of them. Consequently, we do not perceive that the failure to give the charge was capable of producing an unjust result.
Defendant also contends that there should have been a State v. Gross, 121 N.J. 1, 10, 17, 577 A.2d 806 (1990), charge with respect to a prior inconsistent statement of Quinones. In light of the trial court's general charge on prior inconsistent statements and the fact that Quinones was not a suspect, the Gross charge was unnecessary. See State v. Mancine, 124 N.J. 232, 255, 590 A.2d 1107 (1991).
Defendant's third point relates to the trial court's failure to ask the jury if they had been affected by an emotional outburst by the victim's mother. While seated in the audience, she suddenly screamed and began sobbing. The outburst contained no factual information that could have influenced the jury. Another family member immediately escorted her from the courtroom and the jury was removed. After a brief recess, during which defendant unsuccessfully moved for a mistrial, the jury was recalled and firmly instructed to ignore the outburst and to decide the case without bias, prejudice, or sympathy. Although a poll of the jury would have been appropriate, its absence was harmless error, at worst, particularly in light of the defenses raised, the concessions made by the defense, and the overwhelming strength of the State's case. See State v. Loftin, 146 N.J. 295, 363-67, 680 A.2d 677 (1996).
Defendant's fourth point relates to the length of his sentence. The trial court's thorough statement of reasons demonstrated adherence to the sentencing guidelines. The findings with respect to the aggravating and mitigating facts were based on credible evidence, and the aggregate sentence does not shock the judicial conscience. Therefore, affirmance of the sentences imposed is in order. State v. Roth, 95 N.J. 334, 362-66, 471 A.2d 370 (1984).

III.
We turn to the defendant's principal argument, the court's handling of the jury's request to hear the testimony of Carolyn Brown, Leslie Brown, and Denise Dozier. The issue arose while the jury was deliberating. The court received a written request from the jury, which said: "Clarification is requested. We would like: Carolyn Brown's testimony (transcript) ... Leslie Brown transcript[.] Denise Dozier transcript[.]" The court brought the jury into the courtroom and addressed the jurors in these words:
Folks, I'm in receipt of your question which is clarification is requested. We would like Carolyn Brown's testimony transcript, Leslie Brown transcript, Denise Dozier transcript. If by transcript, the reference was to their prior statements[,] I don't recall that they were admitted into evidence, which means although they may have been marked for identification asto at least one or two of themI believe that was the caseyou're not entitled to hear it because it wasn't admitted into evidence. However, we can play you those portions of the tape.
What occurred next with respect to the actual replay of the testimony was not entirely clear from the taped transcript because recording was suspended shortly after the court made the above comment. Consequently, we granted defendant's motion for a temporary remand to reconstruct the record. After reviewing a transcript of the reconstruction hearing, we determined that a second remand was required to clarify points of fact not addressed in the first remand proceeding. The result was an undated order, filed April 22, 1999, describing the unrecorded events in greater detail, and a copy of the *666 jury's question. Based on our review of the transcript of the first remand hearing, the order, and the written copy of the jury's question, the following facts have been established regarding what occurred while the tape recording machine was not functioning.
In response to the jury's request, the court first instructed the clerk to replay the testimony of Carolyn Brown. The court neither decided nor indicated to the clerk that the replay should be limited to the direct-examination. At the conclusion of Carolyn Brown's direct-examination, the clerk either stopped the tape or there was a lengthy pause following Brown's answer to the prosecutor's last question. During this stoppage or pause, the foreman of the jury said something to the effect of "okay, fine", at which point, as described by defense counsel, the jury "got up and they left the courtroom." At that point, according to the original transcript, defense counsel addressed the court, saying: "I think that in the interest of justice, Judge, they should be required to hear the whole statement...." The prosecutor objected to the request on the ground that the foreman's comment and the jury's action indicated that they did want to hear the cross-examination. The court agreed with the prosecutor, saying, "Unless they want to hear the cross-examination, I will not compel them to." The court also refused defendant's request that the court ask the jury if they wanted to hear the cross-examination of this witness. Actually, we might add, there is no indication in the record that the jury even knew that the replay of the direct examination had been concluded.
Thereafter, the trial court proceeded to play back the testimony of Leslie Brown and Denise Dozier. Leslie's cross-examination was not played for the jury. With respect to Dozier, the foreman indicated after the direct-examination had been played that the jury had heard enough. In each instance, defense counsel argued that the cross-examination should be played or that the jury should be asked, at least, if they wanted to hear the cross-examination. The requests were denied.
The governing principles of law are settled. State v. Garrigan, 126 N.J.Super. 442, 315 A.2d 415 (App.Div.1973), aff'd o.b., 64 N.J. 287, 315 A.2d 385 (1974), held that a judge is not required to continue the reading of testimony when the jury indicates it has heard enough:
The rules governing the reading of testimony at the jury's request are set forth in State v. Wolf, 44 N.J. 176, 185-186, 207 A.2d 670 (1965). See also, State v. Wilkerson, 60 N.J. 452, 460, 291 A.2d 8 (1972). The rule simply stated provides that the grant of such a request is in the discretion of the trial judge, but that the judge should readily accede when the jurors request to hear testimony read, absent some unusual circumstances. Here, Judge Schoch did accede to the jurors' request. The reading was not completed because the jurors requested that it be terminated, even though all of the testimony originally requested to be read had not been read. We find nothing in Wolf or Wilkerson, above, which requires a trial judge to continue the reading of testimony commenced at the jurors' request after the jurors asked that the reading be terminated, particularly where, as here, defendant offered no objection and did not ask that the reading be continued and thus acquiesced in the jurors' request that it be terminated.

[Id. 446-447, 315 A.2d 415.]
And in State v. Cox, 101 N.J.Super. 470, 480-81, 244 A.2d 693 (App.Div.1968), certif. denied, 53 N.J. 510, 251 A.2d 449 (1969), we observed, "Nor was it an abuse of the court's discretion to fail to have reread to the jury all of Officer Peters' testimony in response to the jury's request, when the jury thereafter indicated that it had heard enough."
Therefore, at least with respect the testimony of Carolyn Brown and Denise Dozier, *667 the question is not, as seems to be suggested by defense counsel, whether the trial court erred in responding to an uncircumscribed request for a witness's testimony by replaying only the direct-examination. Rather, the question is whether the trial court erred by acceding to the jury's request to hear no more of the witnesses's testimony after the replay of their direct-examination.
The subject case is distinguishable from State v. Garrigan, supra, in one respect. Here, the defense attorney did ask that the reading be continued, or, at least, that the judge inquire of the jury whether they would like to hear the cross-examination of these witness. However, in State v. Wolf, 44 N.J. 176, 207 A.2d 670 (1965), the Court said that a trial court
should not burden a jury with unnecessary reading they do not indicate a need to hear, and it is not error to decline to read further portions of the evidence simply because a party so demands.

[Id. at 185-86, 207 A.2d 670.]
Given these principles, we are satisfied that the trial court did not err in acceding to the jury's request, made at the conclusion of the direct-examination of Carolyn Brown and Denise Dozier, to stop the replay.
Even if we assume that the jury's request to hear no more of the testimony of Carolyn Brown and Denise Dozier was not sufficiently clear to warrant the action taken by the trial court of refusing to play their cross-examination, a reversal would still not be warranted. The general principle is that a jury's uncircumscribed request for the read-back of a witness's testimony "is presumed to include cross-examination which impeaches the testimony which is read back." People of State New York v. Jenkins, 168 A.D.2d 315, 562 N.Y.S.2d 648 (1990) (citing People v. Sepulveda, 44 A.D.2d 846, 355 N.Y.S.2d 637 (1974)), appeal denied, 568 N.Y.S.2d 921, 77 N.Y.2d 878, 571 N.E.2d 91 (1991); see also People of State of New York v. Faulkner, 195 A.D.2d 384, 600 N.Y.S.2d 231, 232 (1993). But the failure to include the cross-examination is not error per se. More is required. When the cross-examination has been withheld from the jury, the defendant must demonstrate prejudice by showing that the cross-examination in fact impeached significant testimony that was read back. See Jones v. Texas, 706 S.W.2d 664, 668 (Tex.Crim.App.1986) (en banc) (holding that reversal was required primarily because the omitted cross-examination "clearly bore on the disputed issue....").
Although Carolyn Brown's cross-examination contained impeaching material, none of it bore significantly on a disputed issue. In other words, her cross-examination did not support the theory that defendant shot in self-defense. Moreover, the defendant failed to introduce any substantive evidence of self-defense since neither he nor anyone else testified that the victim appeared to be reaching for a gun, and his own expert conceded that defendant had acted knowingly. As to Denise Dozier, defendant does not suggest that anything contained in her cross-examination impeached her direct-examination or bore on an issue in dispute.
The trial court's refusal to replay the cross-examination of Leslie Brown was clearly erroneous since the jury did not indicate that it had heard enough at any point. Thus, there was no basis for the court's assumption that the jury only wanted to hear her direct testimony.
But, there is nothing in defendant's brief, which focuses almost exclusively on the significance of the cross-examination of Carolyn Brown, indicating that any portion of the cross-examination of Leslie Brown impeached her direct testimony or contained material of importance to defendant. She, like Dozier, merely described the essentially uncontroverted events occurring during the party. Therefore, we are satisfied that the error did not have the capacity to lead the jury *668 "to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971); accord R. 2:10-2.
Affirmed.