UNITED STATES of America
v.
Frank A. TROBACK.
Crim. No. 74–674.

United States District Court,
E. D. Pennsylvania.

Dec. 12, 1975.

Thomas E. Mellon, Jr., Asst. U. S. Atty., Philadelphia, Pa., for U. S.

Robert E. Gabriel, Philadelphia, Pa., for Troback.

## OPINION

DITTER, District Judge.

Defendant, Frank Troback, was convicted by a jury of knowingly causing stolen securities to be transported in interstate commerce in violation of 18 U. S.C. § 2314. Since he admittedly caused the securities to move interstate, and since he admitted they had been stolen, the only issue at trial was his guilty knowledge. Challenging evidentiary rulings and my instructions to the jury, defendant has moved for judgment of acquittal, or in the alternative, for a new trial. For the reasons which follow, both motions will be denied.

Viewed as it must be, in the light most favorable to the Government, see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, reh. denied, 315 U.S. 827, 62 S.Ct. 629, 86 L. Ed. 1222 (1942); *United States v. McClain*, 469 F.2d 68, 69 (3d Cir. 1972), the evidence adduced at trial establishes that on March 11, 1968, the defendant, an attorney, began working as trust officer for the Midland Bank and Trust Company in Paramus, New Jersey. A month earlier the bank had purchased on behalf of one of its clients various municipal bonds in the amount of $50,000., taking deliveries of $30,000., $10,000., and $10,000., on Februrary 19, 1968, March 20, 1968, and April 11, 1968, respectively. In May of the same year Midland moved to new offices and by March, 1969, it was apparent to the bank that these securities were missing. Meanwhile in February of 1969, the defendant had left the employment of the bank.

The bonds next appeared in September, 1972, when defendant pledged them as collateral for a loan which he obtained at Bankers Trust, a Poughkeepsie, New York, bank, of which a person-

al friend was the president. In August, 1973, the defendant was able to pay back his loan in the New York bank by obtaining a loan at the Lancaster branch of the Farmers National Bank, Lititz, Pennsylvania. The defendant pledged the same securities as collateral for this loan, and instructed the New York bank to mail them to the Pennsylvania bank. In June, 1974, the defendant decided to cash the bonds, and instructed the bank in Lancaster to sell them. Once the securities were sent back to the original underwriters [1] it was discovered that they had been stolen. The Farmers Bank, upon notification of the status of the bonds, contacted the defendant in the hope that he might offer some explanation. The defendant was unable to do so, and the bank thereupon requested the FBI to investigate the matter.

In August, 1974, Special Agent Patrick A. Philbin of the FBI interviewed Mr. Troback. Mr. Troback admitted that he had been the trust officer at the Paramus bank from which the bonds were stolen, said that he knew who had taken the bonds from the bank, but refused to reveal that person's identity. He also said that he could not be prosecuted because the five year federal statute of limitations had expired the prior year. He then related that the bonds were part of his mother-in-law's estate, although he did not explain the manner in which she came into their possession. Finally, he told Agent Philbin that he could not be prosecuted for having made a false statement to the FBI, which had investigated the theft of the bonds in 1969, because he had not been under oath on that occasion as required by a recent Supreme Court decision.

At trial, defendant took the witness stand in his own behalf, and testified that he had worked at the Midland Bank and Trust Company, Paramus, New Jersey, from March 11, 1968, until February 28, 1969. He denied ever having seen the bonds in question or having them in his possession until a few days after his mother-in-law's death on February 15, 1971. According to Mr. Troback, he and Mrs. Troback went to the apartment where her mother had lived alone in order to make the necessary arrangements to clean it out. His wife found the bonds in a cabinet in that apartment.

Mrs. Troback's mother, Margaret Shirk, had been a widow since 1958. Prior to her husband's death, she had spent many years in a mental hospital, and when he died her total assets were approximately $35,000. Thereafter, her only income was from a small veteran's pension and social security. Mrs. Shirk was not sophisticated in financial affairs, and had resisted Mr. Troback's suggestions that she purchase securities after her husband's death. She had had only two contacts with the Midland Bank and Trust Company. On one occasion, Mrs. Troback and her mother stopped to see Mr. Troback while they were on a shopping trip. The only other contact was when Lee Morrill, one of Mr. Troback's fellow employees, stopped at the Troback apartment when he and the defendant were on their way to a social event. Mr. Morrill talked with Mrs. Shirk for approximately 15 minutes and was surprised at how well she could converse in view of the fact that she was totally deaf.

As previously stated, according to Mr. Troback,[2] these negotiable bonds were found in Mrs. Shirk's apartment after her death. In her safety deposit box, however, there were nonnegotiable shares of stock and some cash. Mrs. Troback became the administratrix of her mother's estate, applying for letters of administration on March 8, 1971, approxi-

---

[1.] Count I of the indictment referred to the mailing of the bonds from Poughkeepsie to Lancaster. Counts II, III, and IV were based on the sending of the bonds to the underwriters who were in three separate states.

[2.] Mrs. Troback also testified to this effect.

mately three weeks after Mrs. Shirk died. Subsequent papers filed in connection with the estate made no reference to the stolen bonds or their value, and no inheritance tax was paid on them.

Since Mr. Troback admitted that the bonds were stolen and that his various loan transactions and attempted sale had caused them to be transported from Pennsylvania to New York and from New York to Pennsylvania, the only real issue before the jury was whether or not he knew these securities were stolen at the time these events took place. By its verdict, the jury concluded that he did.

Defendant's first contention is that certain testimony violated his constitutionally protected right to remain silent and was so prejudicial that a mistrial should have been granted despite cautionary instructions to the jury. The matter arose in this way: J. H. Geisenberger, Jr., Esquire, testified that he represented the Farmers' First National Bank, Lititz, the bank which at Mr. Troback's direction had sold the bonds. The bank's account was charged by its correspondent bank, however, when the bond coupons were presented to the underwriters for payment because the bonds had been replaced and the interest had already been paid. As a result, the possibility that the bonds had been stolen became known to the bank and Mr. Geisenberger, as the bank's solicitor, was asked to call defendant to discuss the matter with him. When he received this information, however, the defendant showed no concern and merely stated that his account should be charged and the coupons returned to him (N.T. 2–112–113).

Under limited circumstances, the reaction of an accused to a statement which tends to incriminate him may be admitted in evidence to indicate consciousness of guilt. To constitute such proof, the evidence must disclose that (1) the statement was extra-judicial, (2) it was incriminatory or accusative in import, (3) it was one to which an innocent man in such circumstances would naturally respond, (4) it was uttered in the hearing of the accused, (5) he was capable of understanding the incriminatory meaning of the statement, (6) he had sufficient knowledge of the facts embraced in the statement to answer, and (7) he was at liberty to deny it or reply thereto. An application of this rule is found in *United States v. Alker*, 255 F.2d 851 (3d Cir. 1958), where defendant, an attorney, was charged with wilfully attempting to evade taxes on an estate of which he was executor. Evidence was offered to show that he had removed certain cash from the decedent's safety deposit box, commenting as he did so that there was $500. in each bundle of bills. One of the beneficiaries under the will who was present corrected him by saying, "No, $5000." The defendant made no reply. The Court of Appeals held that in these circumstances a very clear and strong inference of the defendant's assent could be drawn from his failure to challenge a substantial verbal correction of the amount being taken into his possession. It was therefore entirely proper to permit the jury to infer from his silence that he agreed that each package did in fact contain $5000.

In the instant case, the defendant was faced with the possibility that assets worth approximately $50,000., which he had been using as his own for more than three years, might have been stolen and therefore might turn out to be of no value to him. He must have known that if these securities were in fact stolen he might be implicated in their theft and that in any event, his standing as a member of the bar might be jeopardized. Yet he indicated no surprise or dismay. He made no protest. He asked for no inquiry, and neither sought nor offered an explanation; all he said was, "Don't worry about it." From these circumstances, the jury would have been justified in inferring that he had some prior knowledge that the bonds were stolen and that owner-

ship of them would eventually be challenged.

To be sure that the jury would not conclude that this testimony imposed any burden upon the defendant in violation of his Fifth Amendment rights, I immediately gave the following instruction, "And I will also remind you of something that I told you initially, that a defendant is never required to do anything. He is not required to present any evidence. There is no burden resting on the defendant to prove anything." (N.T. 2½₉).

■ The defendant cites *United States v. Smith*, 500 F.2d 293 (6th Cir. 1974), in support of his position.[3] Such reliance is misplaced. In *Smith*, supra, the court held that closing argument by the prosecution which called on defendants, who had not testified, to explain the meaning of certain telephone calls was offensive to the spirit of the Fifth Amendment and violated the defendants' right to a fair trial. Here no such procedure was followed. There was no suggestion that the defendant had any duty to explain anything. The introduction of any evidence which tends to implicate a defendant may increase the pressure upon him to provide some answer. The massing of proof, however, is not regarded as a violation of the privilege against self-incrimination. *Barnes v. United States*, 412 U.S. 837, 846, 93 S. Ct. 2357, 2363, 37 L.Ed.2d 380 (1973). In the instant case, the evidence of guilt was overwhelming and if the receipt of this testimony was error, it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, reh. denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

■ Defendant next contends that I erred when I instructed the jury that an inference of guilty knowledge might be drawn from the unexplained possession of recently stolen property. Specifically, he argues that there is a difference between possession which is unexplained and an explanation which the jury rejects as being unsatisfactory. I see no logical distinction and have found no case which offers any rationale to support such a difference. Moreover, defendant asserts that the jury should have been told that any inference of knowledge from unexplained possession must be reached beyond a reasonable doubt. I can find no case which requires this type of instruction. Where a defendant is charged with a crime involving knowledge that property has been stolen, that knowledge is, of course, one of the essential elements of proof, and must be found by the jury beyond a reasonable doubt. It is quite another thing, however, to say that the jury must be convinced beyond a reasonable doubt *solely* from the fact of possession. In *Barnes v. United States*, supra, the Supreme Court recognized that this argument had been raised but did not impose such a requirement. To the contrary, the Court approved an instruction which said that possession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which a jury may reasonably draw the inference and find, in the light of the surrounding circumstances shown by the evidence, that the person in possession knew the property had been stolen. 412 U.S. at 845–46, 93 S.Ct. at 2363.

The instructions which I gave to the jury in this case not only satisfied the requirements in *Barnes*, but were taken from an appendix to *Pendergrast v. United States*, 135 U.S.App.D.C. 20, 416 F.2d 776, 790, cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969), prepared for the guidance of district courts. It is also the approved form suggested by 2 E. Devitt and C. Blackmar, § 48.11 (1974 Supp.), *Federal Jury Practice and Instructions*.

---

3. Those cases which deal with a defendant who stood mute in the face of police accusations or questions obviously are not applicable here.

Finally, the defendant made no request concerning this portion of the charge and took no exception to it.

■ The defendant also asserts that my instructions to the jury were inadequate because I failed to state that the statute of limitations must be raised as an affirmative defense to criminal charges.

An explanation of the general concept of a statute of limitations was required because the defendant, when speaking with Special Agent Philbin of the FBI, said he could not be prosecuted for having stolen the bonds since the appropriate statute for theft had expired. He was, of course, correct. 18 U.S.C. § 3282. However, there was no reference in the testimony about affirmative defenses, how a statute of limitation is raised by a defendant, or anything else which made an instruction on this aspect of the law applicable. As stated by Judge VanArtsdalen in *United States v. Sink*, 355 F.Supp. 1067, 1072 (E.D.Pa.), affirmed, 485 F.2d 683 (3d Cir. 1973):

> Whether defendant's charge would be proper under any other set of circumstances is not the issue. The central focus should be on the propriety of the charge actually given, . . .

My responsibility, contrary to defendant's argument, was to avoid confusing the jury with irrelevant instructions. *United States v. Parenti*, 326 F.Supp. 717, 732 (E.D.Pa.1971), affirmed, 470 F.2d 1175 (3d Cir. 1972), cert. denied, 411 U.S. 965, 93 S.Ct. 2145, 36 L.Ed.2d 686 (1973). The rationale behind this responsibility is clear. As Judge Rosenn pointed out in *United States v. Blair*, 456 F.2d 514, 520 (3d Cir. 1972),

> A confused jury can give as improper a verdict as one which has failed to receive some significant instruction.

Therefore, the charge should direct and focus the jury's attention on the evidence given at trial, . . . not on far fetched and irrelated ideas that do not sustain a defense to the charges involved [citation omitted].

. . .

■ Defendant next objects to my permitting the reading of certain portions of testimony to the jury at its request. He contends that this gave prejudicial weight to that part of the evidence. It was, and remains my feeling, that in a case of such complexity, a request by the jury for a reading of certain witnesses' testimony should be granted where such evidence is relevant to a critical issue involved (here, the defendant's knowledge that the securities were stolen), and was received in the early stages of the trial. In any event, the power to grant or refuse such a request was well within my discretion as trial judge. See *United States v. Chicarelli*, 445 F.2d 1111 (3d Cir. 1971).

■ As discussed in *United States v. Rabb*, 453 F.2d 1012, 1013–14 (3d Cir. 1971), as a general rule, a trial judge will not permit a reading of a section of testimony where it may either slow the trial or "cause the jury to give that portion undue emphasis." [4] In my opinion, neither result occurred here. On the contrary, the testimony requested by the jury was necessary to a reasonable and proper determination. As such, my granting of the jury's request was not erroneous.

■ Defendant also complains that I permitted one of the prosecution's witnesses, H. E. Johannsen, to testify as to possibilities rather than as to facts. Mr. Johannsen had been employed by the Paramus bank during the year that

---

4. The *Rabb* decision also stands for the proposition that a mere summarization of the evidence by the trial judge instead of a reading of the full portion of requested transcript may constitute reversible error. In the case *sub judice*, I had the court stenographer read the entire relevant portions of the transcript containing the complete testimony of two witnesses.

Mr. Troback was also there. Johannsen was responsible for the safekeeping of certain bank securities, including the bonds referred to in this case. These bonds were received by the president of the bank on three separate dates: February 19, March 20, and April 11, 1968. Mr. Troback's employment began on March 11, 1968. Mr. Johannsen testified that by reason of the securities' physical location, and the fact that they were not under lock and key at all times, in the ordinary course of business he was not the only person in the bank who could have had access to them. On cross-examination, defense counsel brought out the fact that Mr. Troback could not have had access to the first bonds received since he was not employed at the bank when they were delivered. The matter about which Johannsen testified in the terms of possibilities dealt with the time the securities had been placed with him. He stated that he simply did not know whether they were delivered in three instalments, as each was received at the bank, or whether they were accumulated by the bank's president and then handed to him sometime after April 11, 1968. His testimony was not speculative or based upon facts not in evidence—rather, it was the expression of the witness' uncertainty about what had happened approximately six years before. There was no error in its receipt.

■ The defendant's other assignments of error deal with the scope of cross examination and certain redirect examination, the calling of a witness out of turn (even though counsel agreed that it could be done), and the admission of rebuttal testimony.

A trial judge's discretionary evidentiary rulings made within the course of a trial will not result in a new trial unless certain prescribed tests are met. As explained by Judge Hannum in *United States v. Neff*, 343 F.Supp. 978, 980–81 (E.D.Pa.1972):

> . . . Where it is claimed, however, that "error" was committed in the course of the trial, . . . [a] convicted defendant has the burden of showing first, that error was committed and, second, that such error, was prejudicial to him. *United States v. Basen*, supra, 308 F.Supp. [65] at 66; *United States v. Redfield*, supra, 197 F.Supp. [559] at 562. Even if demonstrated to exist, an error which "does not effect substantial rights" is considered "harmless" and shall be disregarded. Federal Rules of Criminal Procedure, Rule 52(a), 18 U.S.C.

As the scope of testimony and order of proof of a criminal trial are within the discretion of the trial judge, minor deviations from traditionally prescribed trial guidelines used to avoid confusion and to administer a jury trial most efficiently are not grounds for a new trial except in the rare case where prejudicial error affecting substantial rights is established. Upon a careful review and consideration of the trial transcripts and the briefs submitted by counsel, I can find no such prejudice even closely sufficient to warrant a new trial. See generally, *United States v. Morris*, 308 F. Supp. 1348 (E.D.Pa.1970).

For the foregoing reasons, then, defendant's motions for judgment of acquittal or a new trial will be denied.